CITY OF MILWAUKEE, a municipal corporation,
Plaintiff-Appellant,†

v.

NL INDUSTRIES, a foreign corporation,
Defendant-Respondent,

MAUTZ PAINT, a Wisconsin corporation, Defendant.

Court of Appeals

*No. 2007AP2873. Oral argument September 17, 2008.
—Decided November 25, 2008.*

2008 WI App 181

(Also reported in 762 N.W.2d 757.)

† Petition to review denied 4/14/09.

443

445

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Christopher P. Riordan* of *von Briesen & Roper, S.C.*, of Milwaukee, and *Michael D. Hausfeld, Richard S. Lewis* and *James J. Pizzirusso* of

*Cohen, Milstein, Hausfeld & Toll, PLLC*, of Washington, D.C., with oral argument by Richard S. Lewis.

On behalf of the defendant-respondent, the cause was submitted on the brief of *James T. Murray* and *Michael J. Wirth* of *Peterson, Johnson and Murray, S.C.*, of Milwaukee and *Donald E. Scott, Andre M. Pauka* and *John M. Hughes* of *Bartlit, Beck, Herman, Palenchar & Scott, LLP*, of Denver, CO, with oral argument by John M. Hughes.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. CURLEY, P.J. The City of Milwaukee (the City) appeals from a final judgment entered on a jury verdict in favor of NL Industries, Inc. (NL Industries). The City raises a total of twelve claims of error. First, the City argues that the special verdict should be changed because the evidence showed that NL Industries intentionally caused the public nuisance found by the jury. In addition, the City argues that a partial new trial should be granted to remedy the following: five purported erroneous rulings on the jury instructions; three allegedly separate instances of improperly admitted evidence; the trial court's decision to dismiss the City's nuisance claim based on reckless conduct; the form of the special verdict related to the City's conspiracy claim; and the trial court's decision granting summary judgment to NL Industries regarding the City's requested future abatement costs.

¶ 2. After reviewing the record, we conclude that the evidence was sufficient to support the jury's finding that NL Industries did not intentionally cause the public nuisance found by the jury. In addition, we conclude that a partial new trial is not warranted on the remaining issues raised by the City. Accordingly, we affirm.

## I. Background.

¶ 3. This appeal follows an earlier remand from this court to the trial court for a trial after we concluded that genuine issues of material fact precluded the grant of summary judgment in the defendants' favor.[1] *See City of Milwaukee v. NL Indus., Inc.*, 2005 WI App 7, 278 Wis. 2d 313, 691 N.W.2d 888 (Ct. App. 2004) (*NL Industries I*). The relevant facts provided in our previous decision are set forth in this opinion. *See id.*, ¶¶ 2–4.

¶ 4. According to the City's complaint, childhood lead paint poisoning is a severe public health problem in Milwaukee. The City alleged that one in five Milwaukee children tested in 1998 showed blood lead levels at or above the Centers for Disease Control threshold for lead poisoning. According to the City, "[t]his extraordinary incidence of childhood lead paint poisoning is linked to Milwaukee's old housing stock." Specifically, the City alleged that childhood lead paint poisoning is caused when children ingest lead-based paint dust and chips.

¶ 5. The alleged main source of this dust and chips was lead-based paint on old wood windows in homes in which children live. The complaint states: "Windows are exposed to weather that causes the paint on them to peel, crack, or chalk, and are subject to friction when they are opened and closed, all of which generates lead dust." In response to the problem of childhood lead poisoning, the City undertook a window abatement program in two target areas of the city.

[1] Mautz Paint was originally named as a defendant; however, after the case was remanded for trial, the claims against it were stayed, and the City proceeded to trial solely against NL Industries.

¶ 6. The City asserted that NL Industries is responsible for these damages because its conduct in marketing and selling substantial quantities of lead pigments and/or lead-based paint in the City of Milwaukee during and after the construction of these dwellings, when it knew the hazards of lead poisoning related to its product, was a substantial factor creating the public nuisance at issue in this case.

¶ 7. Following remand, NL Industries moved for partial summary judgment on the City's request for future damages. The trial court granted the motion, and the case proceeded to trial on the remaining claims.

¶ 8. In its opening statement, the City repeatedly referenced that within the ten years preceding the trial, 19,000 children in Milwaukee were reported to have elevated levels of lead in their blood and were at risk of lead-paint poisoning. The City further referenced that a level of ten micrograms of lead in a deciliter of blood has been identified as "a red flag for the brain damage. That's where we have to worry about the public, at the level of 10 micrograms of lead in a child's blood." In explaining the abatement process to the jury during its opening statement, counsel for the City stated: "The [lead] dust is the hazard that is harming most children."

¶ 9. The evidence revealed that NL Industries was founded in 1891 and dominated the lead manufacturing market throughout most of the twentieth century. It was in the 1970s that experts began to recognize household lead dust as an additional possible source of childhood lead poisoning. In 1978, a law went into effect essentially banning the use of lead in household paint.[2]

---

[2] The first federal law banning the concentration of lead in house paint went into effect in 1971 and pertained only to federal housing. A subsequent law went into effect in 1972 and

¶ 10. Prior to the law's enactment, the jury heard testimony that no agency of the federal government opposed the use of lead house paint; to the contrary, federal agencies recommended its use. In Milwaukee, the jury heard that lead paint was being specified in one way or another from 1900 up to the 1960s "[f]or nearly every conceivable public building: Schools, libraries, museums, play pavilions on playgrounds, [and in] hospitals."

¶ 11. Peter English, Ph.D, M.D., explained the history surrounding childhood lead poisoning. He testified that the first case report on the issue was from 1914 and related to a child who suffered seizures and a coma, and was later discovered to have chewed lead paint off of his crib. Other cases were reported thereafter, and it was observed that the lead was acquired by an abnormal eating pattern referred to as pica, which described "a craving for unnatural articles of food, a depraved appetite." Dr. English distinguished pica from normal hand-to-mouth activity of children and further testified, "this notion of an aggressive eating problem, pica, formed part of the public health community's understanding of the disease from – from the very beginning of the first consensus that happened in the 1930s through into the 1970s."

¶ 12. The evidence revealed that a plethora of health problems are associated with childhood lead poisoning, due to the fact that lead is toxic to a number of organ systems, including developing red blood cells, the kidneys, bones, heart, blood vessels, and the brain. The damage to the developing brain can result in a loss of IQ, along with a host of other behavioral problems.

---

pertained to all housing. The concentration of permissible lead in house paint was reduced again by the 1978 law.

During cross-examination, the City's witness, Philip Landrigan, M.D., explained that the brain is most vulnerable when the lead exposure takes place early in development. The relevant time frame includes time spent in the womb through the five or six years after birth.

¶ 13. Dr. Landrigan acknowledged that the science of lead poisoning changed dramatically throughout the twentieth century. He provided a chronology related to the changing scientific knowledge of the danger associated with lead paint:

> [Counsel for NL Industries:] Then let's go to your residency, your pediatric residency. You graduated in 1967, and in that period of time, you found, did you not, that the main concern then for children in lead paint was not dust, but whether or not they had pica?
>
> [Dr. Landrigan:] That's correct.
>
> [Counsel for NL Industries:] And by pica, you mean the idea that children would actually eat chips of paint.
>
> [Dr. Landrigan:] That's right.
>
> [Counsel for NL Industries:] And that, in fact, was the prevailing opinion of the experts in the 1950s and '60s, that pica was the sole source, the sole route for children's exposure to lead paint.
>
> [Dr. Landrigan:] *That's right. Concepts of dust started to come out in – as best as I can recall, in the 1970s.*
>
> . . . .
>
> [Counsel for NL Industries:] Would you agree, sir, that as late as 1969, 1970, a lead level as high as 60 micrograms was considered safe in children?
>
> [Dr. Landrigan:] It was, yes.
>
> [Counsel for NL Industries:] Then into the mid-1970s,

456

a lead level of as high as 40 was considered safe in children.

[Dr. Landrigan:] Yes, that is correct.

(Emphasis added.)

¶ 14. It was not until 1991 that the Centers for Disease Control issued a report reflecting a public health consensus that lowered the "so-called action level for dealing with lead in children, the level of lead in blood in children," to ten micrograms. Additionally, the consensus in 1991 recognized lead dust as one of the major causes of childhood lead poisoning.

¶ 15. The City's theory at trial was that NL Industries was fully informed of the toxicity of lead when it was selling lead paint, and that whether the harm resulted from pica or lead dust was irrelevant. The City sought to recover costs of abatement in the amount of $52.6 million, spent between 1992 and 2006.[3]

¶ 16. At the close of the City's case-in-chief, NL Industries moved to dismiss the following claims made by the City: that NL Industries negligently, recklessly, or intentionally created the alleged public nuisance; that NL Industries engaged in abnormally dangerous activities; and that NL Industries conspired to create the alleged public nuisance. The trial court took the motions to dismiss as to the City's nuisance claims based on intentional and negligent conduct under advisement and permitted those claims to go to the jury. The trial court granted NL Industries' motion as to the City's claims based on abnormally dangerous activity and reckless conduct. The trial court denied NL Industries' motion to dismiss the conspiracy claim; however,

[3] Had the trial court not granted summary judgment as to the City's claim for future damages, it appears the City would have sought past and anticipated future costs of approximately $150 million.

457

it recognized that the viability of the claim was dependent on whether there was a nuisance. The case proceeded to the jury.

¶ 17. The first special verdict question read: "Between 1992 and the end of 2006, was the presence of lead-based paint in and on houses in the City of Milwaukee a public nuisance?" The jury answered "yes." The second special verdict question asked: "Did NL Industries intentionally and unreasonably engage in conduct that was a cause of the public nuisance?"[4] The jury answered "no." In addition, the jury answered "no" to the third special verdict question, which asked: "Did NL Industries negligently engage in conduct that was a cause of the public nuisance?" Because the jury answered "no" to the second and third questions, the special verdict form directed the jurors not to answer the remaining questions related to the City's conspiracy and damages claims.[5]

---

[4] The City did not object to combining the question of intent and the question of causation on the verdict form.

[5] In its entirety, the special verdict read as follows:

### Public Nuisance Claim

**QUESTION 1.** Between 1992 and the end of 2006, was the presence of lead-based paint in and on houses in the City of Milwaukee a public nuisance?

ANSWER: *Yes*

*If you have answered Question 1 "no," your verdict is complete. Do not answer any further questions. If you have answered Question 1 "yes," then answer the following questions, unless the instructions indicate that you should not answer a question.*

**QUESTION 2.** Did NL Industries intentionally and unreasonably engage in conduct that was a cause of the public nuisance?

ANSWER: *No*

458

¶ 18. The City filed a motion to change the special verdict as to the second question and a motion for a new trial, both of which the trial court denied. The City now appeals. Additional facts are provided in the remainder of this opinion as needed.

## II. ANALYSIS.

*A. The evidence was sufficient to support the special verdict.*

1. Standard of Review.

¶ 19. The City challenges the sufficiency of the evidence to support the jury's "no" answer to the second

---

*QUESTION 3.* Did NL Industries negligently engage in conduct that was a cause of the public nuisance?

ANSWER: *No*

### Conspiracy Claim

*QUESTION 4.* *[Answer this question only if you have answered "yes" to Question 2 OR Question 3.]* Did NL Industries engage in a conspiracy with one or more others that was a cause of the public nuisance?

ANSWER: *[Left Blank By Jury]*

*QUESTION 5.* *[Answer this question only if you have answered "yes" to Question 4.]* Did NL Industries or one of its co-conspirators perform any act in furtherance of that conspiracy?

ANSWER: *[Left Blank By Jury]*

### Damages

*QUESTION 6.* *[Answer this question only if you have answered "yes" to Question 2 OR Question 3 OR Question 5.]* What sum of money, if any, will fairly and reasonably compensate the City of Milwaukee for past expenditures incurred to abate the public nuisance?

ANSWER: $*[Left Blank By Jury]*

(Formatting as it appears in original.)

459

question on the special verdict, which read: "Did NL Industries intentionally and unreasonably engage in conduct that was a cause of the public nuisance?"[6] The City contends: "[T]he undisputed evidence at trial established that by 1944, at the latest, NL knew that childhood lead paint poisoning was a serious public health hazard, yet it continued to sell and promote lead paint for decades." As a result, the City requests that we change the special verdict.

¶ 20. WISCONSIN STAT. § 805.14(1) (2005–06) sets forth the standard that applies to both the trial court's and this court's review of a challenge to the sufficiency of the evidence.[7] *See Richards v. Mendivil*, 200 Wis. 2d 665, 670, 548 N.W.2d 85 (Ct. App. 1996). It provides in relevant part as follows:

> **(1)** TEST OF SUFFICIENCY OF EVIDENCE. No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.

Sec. 805.14(1).

██ ██

¶ 21. Accordingly, " 'if there is any credible evidence which, under any reasonable view, fairly admits

---

[6] The City does not argue that the evidence was insufficient to support the conclusion that NL Industries' conduct was reasonable. We discuss *infra* in ¶¶ 47–53, the City's argument related to the propriety of the jury instruction and special verdict question incorporating the element of reasonableness.

[7] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

of an inference that supports a jury's finding, that finding may not be overturned.' " *General Star Indem. Co. v. Bankruptcy Estate of Lake Geneva Sugar Shack, Inc.*, 215 Wis. 2d 104, 122, 572 N.W.2d 881 (Ct. App. 1997) (citation and brackets omitted). This is particularly true when the trial court upholds the verdict after denying postverdict motions. *See Radford v. J.J.B. Enters., Ltd.*, 163 Wis. 2d 534, 543, 472 N.W.2d 790 (Ct. App. 1991). On review, it is our responsibility "to look for credible evidence to sustain the jury's verdict, not to search the record for evidence to sustain a verdict that the jury could have reached, but did not." *Nowatske v. Osterloh*, 201 Wis. 2d 497, 511, 549 N.W.2d 256 (Ct. App. 1996).

¶ 22. To establish liability for the public nuisance found by the jury, the City was required to establish a causal connection between the nuisance and underlying tortious acts attributable to NL Industries. Our supreme court has explained the dichotomy between a nuisance and liability for a nuisance as follows:

> At the outset, it is imperative to distinguish between a nuisance and liability for a nuisance, as it is possible to have a nuisance and yet no liability. A nuisance is nothing more than a particular type of harm suffered; liability depends upon the existence of underlying tortious acts that cause the harm. The RESTATEMENT (SECOND) OF TORTS illustrates this point:
>
>> [F]or a nuisance to exist there must be harm to another or the invasion of an interest, but there need not be liability for it. *If the conduct of the defendant is not of a kind that subjects him to liability . . . the nuisance exists, but he is not liable for it.*

*Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*, 2005 WI 8, ¶ 25, 277 Wis. 2d 635, 691 N.W.2d 658

461

(emphasis in *Milwaukee Metro. Sewerage Dist.*; quoting RESTATEMENT (SECOND) OF TORTS § 821A cmt. c).

¶ 23. The RESTATEMENT (SECOND) OF TORTS § 825 sets forth the requirements for establishing intentional conduct in the context of a public nuisance. *See id.*, cmt. b. It provides, in relevant part: "[A]n interference with the public right, is intentional if the actor (a) acts for the purpose of causing it, or (b) knows that it is resulting or is substantially certain to result from his conduct." *Id.*; *see also Milwaukee Metro. Sewerage Dist.*, 277 Wis. 2d 635, ¶ 37 (applying § 825).

 2. There is credible evidence in the record that NL Industries did not know that the public nuisance found by the jury was resulting or was substantially certain to result from its conduct.

¶ 24. The first step in the analysis is determining what the public nuisance was that the jury found to exist. Once this is established, we can determine whether there is credible evidence in the record to support the jury's conclusion that NL Industries did not know that the public nuisance was resulting or was substantially certain to result from its conduct.[8] *See* RESTATEMENT (SECOND) OF TORTS § 825.

¶ 25. The City argues that the public nuisance was the presence of lead paint in and on houses in the City of Milwaukee based on the language of question one in the special verdict (i.e., "QUESTION 1. Between 1992 and the end of 2006, was the presence of lead-based paint in and on houses in the City of Milwaukee

---

[8] The City does not argue that NL Industries acted for the purpose of causing the public nuisance found by the jury. *See* RESTATEMENT (SECOND) OF TORTS § 825(a).

a public nuisance?"). We disagree with the City that the public nuisance is solely determined by the language of the special verdict. "It is well established that upon reviewing a jury's special verdict answers or other findings, we may refer to whatever facts in the record support the jury's findings. Similarly, we may turn to supporting documents in the record to interpret a jury's findings." *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 86, ¶ 9 n.10, 311 Wis. 2d 492, 753 N.W.2d 448 (citations omitted).

¶ 26. The trial court inquired with counsel, as it listened to arguments on NL Industries' motion to dismiss after the City's case-in-chief, whether the jury had to find that NL Industries was substantially certain that its activities would cause childhood lead paint poisoning or whether the jury simply had to find that NL Industries was substantially certain that its selling of lead pigment and paint would result in the presence of lead paint in homes.

> [The Court:] And this is a huge, huge gulf here between having knowledge that your conduct is likely to cause paint to be on walls and knowledge that your conduct is likely to cause childhood lead paint poisoning, and the jury's entitled to know which of those two things need to be proven . . . .
>
> . . . .
>
> [Counsel for the City:] Your Honor, I don't believe it's merely putting paint on walls. In terms of the intentional conduct, they're selling with knowledge that the product is hazardous as used. That – that – I think that's somewhere between the two options that you gave me. It's not simply knowing that paint is going on walls. It's the knowledge of the hazard to children, which is part of that – the knowledge component that we must prove under intentional tort.

¶ 27. As evidenced by the City's own statements in response to the trial court's inquiry, it was not the mere presence of lead paint on the walls that was the nuisance; rather, it is clear from the record that the public nuisance was the hazardous childhood lead exposure—lead exposure caused not only by chewing on lead painted surfaces (i.e., pica), but also from ingestion of lead dust and chips through normal hand-to-mouth activity. This is reflected by the City's own assertion during its opening statement: "The [lead] dust is the hazard that is harming most children."

¶ 28. The City wants this court to focus on the fact that lead paint is hazardous and argues that we should not distinguish between whether the hazard results from pica or lead dust. Presumably, this is because there was evidence at trial that the hazard of lead dust was unknown during the time NL Industries was manufacturing and selling lead pigment and paint.

¶ 29. The trial court made the distinction the City argues against. As a result, the City claims it was improperly required to prove that NL Industries had "perfect foresight" of the precise public nuisance that resulted. The City's claim in this regard is based on the trial court's decision denying its motion to change the special verdict. In its decision, the trial court wrote:

> During the 1930s, it became apparent that the toxicity of lead was not simply a health problem for those who worked in the lead industry or with lead paint. It was causing serious injury and death to children who, apparently attracted to the taste, ingested paint by chewing on toys or cribs or other painted surfaces. Decades later a much more subtle and insidious problem was identified, as it became clear that the mere presence of lead paint inevitably

resulted in the presence of lead dust and chips and that, through the ordinary hand to mouth activities of very young children, lead was being ingested. It further became clear that this process was sufficient to cause great damage at blood levels much lower than were previously thought dangerous.

¶ 30. The City appeals from the trial court's decision, arguing that "[l]iability for causing an intentional nuisance does not depend on awareness of the exact scientific mechanism of how one's conduct is causing harm. It is knowledge of the harm itself, not knowledge of the method of how the harm occurred, which is important under Wisconsin law."

¶ 31. We disagree. First, the record belies the City's contention that it was required to prove that NL Industries had "perfect foresight" of the resulting public nuisance. After the City had presented its case-in-chief, the trial court, in deciding NL Industries' motion to dismiss the City's nuisance claim based on intentional conduct, discussed what the City was required to prove to establish the claim. The trial court specifically stated that knowledge of some specific fact or particular information was not required. The trial court explained:

> I have concluded that to establish a nuisance claim based on intentional conduct, the plaintiff in this case must prove that the defendant knew that an interference with a public right was resulting or was substantially certain to result from the promotion and sale of lead pigment and paint. I also conclude that in this case, that means knowledge that lead poisoning – lead poisoning in children would occur.
>
> . . . .
>
> . . . I agree with the City that it is not necessary to prove that NL knew some specific fact or had some

465

particular information about the risk or hazards that others did not have. I agree with the City that the foreseeability of the injury should not be reduced to foreseeability of harm at some particular blood level measured in micrograms per deciliter. But what was foreseen, what was reasonably certain to happen, what someone believed was reasonably certain to follow has to be judged not by some particular measure of lead in the blood but by what was known at the time the conduct was engaged in.

¶ 32. Likewise, the jury instructions do not support the City's contention that it was required to prove NL Industries had "perfect foresight." The jury instructions repeated the special verdict question related to whether NL Industries intentionally and unreasonably engaged in conduct that was a cause of the public nuisance and further provided in relevant part as follows:

### Question 2: Intentionally and Unreasonably Causing a Nuisance

**Question 2 asks:** Did NL Industries intentionally and unreasonably engage in conduct that was a cause of the public nuisance? Before you may answer this question "yes," you must be satisfied that NL Industries acted intentionally and unreasonably, and that its intentional and unreasonable conduct was a cause of the public nuisance.

*"Intentionally."* An interference with a public right is deemed to be "intentional" if the defendant acted for the purpose of causing it or knows that it is resulting or is substantially certain to result from his conduct. Thus, NL Industries acted intentionally if it intended to create the public nuisance at issue in this

case, or if it knew that its conduct was substantially certain to cause such a nuisance.[9]

---

[9] In its entirety, the instruction related to special verdict question two provides:

### Question 2: Intentionally and Unreasonably Causing a Nuisance

*Question 2 asks:* Did NL Industries intentionally and unreasonably engage in conduct that was a cause of the public nuisance? Before you may answer this question "yes," you must be satisfied that NL Industries acted intentionally and unreasonably, and that its intentional and unreasonable conduct was a cause of the public nuisance.

*"Intentionally."* An interference with a public right is deemed to be "intentional" if the defendant acted for the purpose of causing it or knows that it is resulting or is substantially certain to result from his conduct. Thus, NL Industries acted intentionally if it intended to create the public nuisance at issue in this case, or if it knew that its conduct was substantially certain to cause such a nuisance.

*"Unreasonably."* In determining whether NL Industries acted unreasonably, you may consider all of the circumstances related to the defendant's conduct, the creation of the public nuisance at issue, and the extent of any harm or injury that was a consequence of the public nuisance. In determining whether NL Industries acted unreasonably, you may consider whether the conduct of NL Industries was in compliance with existing laws. However, the fact that the defendant's conduct may not have been in violation of any existing law does not necessarily relieve the defendant of liability in this case. You may find that the defendant's otherwise lawful conduct was unreasonable under all of the circumstances presented by the evidence in this case.

*"A Cause."* This question does not ask about "the cause" but rather "a cause" because a public nuisance may have more than one cause. NL Industries is responsible for causing the alleged public nuisance if you find that its intentional and unreasonable conduct was *a substantial factor* in producing the public nuisance. A public nuisance may be caused by the conduct of a single person or entity or the combined conduct of any number of people or entities.

"Substantial factor," as that term is used here, means that NL Industries' misconduct had such an effect in producing the public

467

(Footnote added; formatting as it appears in original.) Under these instructions, the jury was asked to find that NL Industries' intent or knowledge related to its conduct be linked to the public nuisance at issue, not that NL Industries was aware of the exact scientific mechanism of how its conduct was causing harm.

¶ 33. To support its position, the City claims that in determining whether the intentional conduct standard was met, the question is "whether the defendant knew it was causing danger and, in the face of that knowledge, whether the defendant continued its conduct." It relies on *Vogel v. Grant-Lafayette Electric Cooperative*, 201 Wis. 2d 416, 548 N.W.2d 829 (1996), a stray voltage case, and claims it "met the *Vogel* intentional conduct standard by proving that NL sold and promoted its lead pigment and lead paint knowing or being substantially certain that the threat of childhood lead poisoning (or public harm) would result." We disagree with the City's reading of *Vogel*.

¶ 34. In *Vogel*, our supreme court quoted with approval RESTATEMENT (SECOND) OF TORTS § 825 cmt. c:

> "It is the knowledge that the actor has at the time he acts or fails to act that determines whether the invasion resulting from his conduct is intentional or unintentional. It is not enough to make an invasion intentional that the actor realizes or should realize that this conduct involves a serious risk or likelihood of causing the invasion. He must either act for the purpose of

nuisance and resulting injury as to lead reasonable people to regard it as a cause, in the sense that the use of the term "cause" brings to mind the idea of responsibility. A substantial "cause" does not include every one of a great number of events without which the alleged public nuisance and alleged injury in question would not have occurred.

(Formatting as it appears in original.)

causing it or know that it is resulting or is substantially certain to result from his conduct."

*Vogel*, 201 Wis. 2d at 430–31 (citing Restatement (Second) of Torts § 825 cmt. c). *Vogel* held: "It is the unreasonable levels of stray voltage that may give rise to liability for an intentional invasion, not the use of a multi-grounded delivery system with interconnecting neutrals." *Id.* at 432. To support its conclusion that the electric cooperative defendant had not acted intentionally, the court pointed out that the Vogels failed to reference any evidence in the record establishing that the electric cooperative had knowledge that its system was resulting in unreasonable levels of stray voltage on the Vogels' farm, prior to the time when the Vogels first contacted the electric cooperative to complain that their cows were suffering the effects of stray voltage. *See id.*

¶ 35. Following *Vogel*, we agree with the trial court that it was not enough for the jury to find that NL Industries anticipated "a harm" or "some harm," which would in essence result in strict liability for nuisance "whenever some harm could be anticipated even though nothing close to a *public* nuisance was forseeable." (Emphasis in trial court's decision.) Instead, the City had to prove that NL Industries anticipated the public nuisance found by the jury, which was hazardous childhood lead exposure caused not only by chewing on lead painted surfaces, but also from ingestion of lead dust and chips through normal hand-to-mouth activity.

¶ 36. Our review of the record reflects that the testimony during trial largely centered on the harm to children caused by lead dust. This was a key component of the hazardous childhood lead exposure that formed the basis of the City's public nuisance claim. During

trial, the City sought to meld the knowledge of the hazardous lead exposure resulting from pica with the later knowledge of hazardous lead exposure resulting from lead dust to form a continuum of knowledge on the part of NL Industries. It sought to do so despite the evidence that the lead-dust hazard was unknown during the time NL Industries was manufacturing and selling lead pigment and paint.[10]

¶ 37. Although the City would have us focus on other evidence in the record that arguably would have permitted the jury to reach a different result, that is not our role in reviewing the sufficiency of the evidence to support the jury's finding. *See Nowatske*, 201 Wis. 2d at 511; *Hunzinger Constr. Co. v. Granite Res. Corp.*, 196 Wis. 2d 327, 337, 538 N.W.2d 804 (Ct. App. 1995) ("It was in the jury's province to accept or reject any or all of th[e] evidence [presented at trial in determining its verdict]."). Here, the City's expert witness, Dr. Landrigan, acknowledged that the science of lead poisoning changed dramatically throughout the twentieth century. He testified that through the 1960s, the sole source for children in terms of exposure to lead paint was pica, not lead dust. Lead-dust concepts did not emerge until the 1970s, and even then, in the mid-1970s, a lead level of forty micrograms was considered to be safe in children.

¶ 38. We conclude that there is credible evidence in the record to support the jury's conclusion that NL

---

[10] The City argued in its reply brief that it "presented evidence that NL was substantially certain it was causing serious public harm during the years it was selling and promoting lead paint ... and that this harm was *a related and a natural precursor* to the public nuisance suffered by Milwaukee in the 1990s." (Emphasis added.)

Industries did not know that the public nuisance found by the jury was resulting or was substantially certain to result from its conduct, where the dangers associated with lead dust, which are largely responsible for the hazardous childhood lead exposure at issue, were unknown during the time NL Industries sold lead pigment and paint. As a result, we will not overturn the jury's answer to special verdict question two.

¶ 39.　As stated, the City did not object to combining the separate issues of intentional conduct and causation into a single question on the verdict form. Given the wording of the special verdict question, because we have concluded that there is sufficient evidence to support the jury's conclusion that NL Industries did not act intentionally, we need not address whether the City proved that NL Industries was a substantial factor in causing the public nuisance.

## B. The City is not entitled to a partial new trial.

¶ 40.　Next, the City argues that a partial new trial should be granted to remedy what it contends were erroneous rulings on the jury instructions, the admissibility of evidence, the dismissal of its nuisance claim based on reckless conduct, the format of the special verdict related to its conspiracy claim, and the grant of summary judgment to NL Industries regarding its requested future abatement costs. We disagree.

### 1. Jury Instructions.

¶ 41.　The City claims that the jury instructions contained fundamental errors that misled the jury. Specifically, the City argues that the trial court erred:　(a) when it instructed the jury on the tort of

471

private nuisance; (b) when it told the jury that NL Industries created a public nuisance only if its conduct was both intentional *and* unreasonable; (c) when it instructed the jury that NL Industries' conduct was intentional if it intended to create the public nuisance "at issue" in this case; (d) when it declined to instruct the jury that NL Industries' conduct met the intentional standard, even if it was not substantially certain that harm would result when its conduct began, but if NL Industries continued its activities after learning that harm was substantially certain to result from its conduct; and (e) when it declined to give the City's proposed jury instruction regarding NL Industries' purported agency relationship with the Lead Industries Association (LIA).

■

¶ 42. We review with deference the instructions provided to the jury. *State v. Wille*, 2007 WI App 27, ¶ 23, 299 Wis. 2d 531, 728 N.W.2d 343.

> The [trial] court has broad discretion as to the instructions it will give to a jury in any particular case. Instructions must fully and fairly inform the jury about the applicable principles of law. As long as the instructions adequately advise the jury of the law it is to apply, the court has the discretion to decline to give alternative or modified instructions even though they may properly state the law. If the jury instructions are not erroneous, the court's exercise of discretion will be affirmed on appeal. If an instruction is erroneous, a new trial will not be ordered unless the court's error was prejudicial.

*Horst v. Deere & Co.*, 2008 WI App 65, ¶ 13, 312 Wis. 2d 421, 752 N.W.2d 406 (citations omitted). We now address each of the City's arguments regarding what it contends were erroneous jury instructions.

*a. Private nuisance.*

¶ 43. For the first question on the special verdict form, the trial court instructed the jury as follows:

> **Question 1 asks:** Between 1992 and the end of 2006, was the presence of lead-based paint in and on houses in the City of Milwaukee a public nuisance?
>
> A public nuisance is a condition that unreasonably interferes with a right common to the general public. A public nuisance requires an injury to the community or the general public, in contrast to *a private nuisance,* which requires an interference with a person's use or enjoyment of private property.
>
> A condition does not become a public nuisance simply because it interferes with the use and enjoyment of land by a large number of persons or causes injury to many persons. There must be some interference with a public right, such as an interference with the health or safety of the general public. However, a public nuisance need not directly affect all members of a community, as long as there is an interference with a right common to the general public.

(Emphasis in original jury instructions.)

■

¶ 44. The City argues that the language contrasting a private nuisance with a public nuisance was not proposed by either party and, in fact, was specifically objected to by the City. The City claims that this instruction confused the jury and that the confusion was exacerbated by NL Industries' references to what the City terms "the non-existent private nuisance cause of action" in its closing argument.

¶ 45. The jury answered "yes" to the question on the special verdict inquiring: "Between 1992 and the

end of 2006, was the presence of lead-based paint in and on houses in the City of Milwaukee a public nuisance?" Consequently, because this question was answered favorably for the City, any alleged error in this instruction was harmless. *See* WIS. STAT. § 805.18(2).[11]

█

¶ 46. Furthermore, the definition provided in the jury instructions was consistent with that provided in the case law and the restatement section addressing public nuisances. *See Milwaukee Metro. Sewerage Dist.*, 277 Wis. 2d 635, ¶¶ 27–28 (distinguishing the nature of the interests invaded where private and public nuisances are involved as follows: " 'The essence of a private nuisance is an interference with the use and enjoyment of land.' . . . In contrast, '[a] public nuisance is a condition or activity which substantially or unduly interferes with the use of a public place or with the activities of an entire community' " (citations omitted));

---

[11] WISCONSIN STAT. § 805.18(2) provides:

> (2) No judgment shall be reversed or set aside or new trial granted in any action or proceeding on the ground of selection or misdirection of the jury, or the improper admission of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial.

Before we will conclude that the error complained of has affected the party's substantial rights, "there must be a reasonable possibility that the error contributed to the outcome of the action or proceeding at issue . . . . If the error at issue is not sufficient to undermine the reviewing court's confidence in the outcome of the proceeding, the error is harmless." *Evelyn C.R. v. Tykila S.*, 2001 WI 110, ¶ 28, 246 Wis. 2d 1, 629 N.W.2d 768 (citations omitted).

RESTATEMENT (SECOND) OF TORTS § 821B cmt. h (describing the relation between public and private nuisance: "Unlike a private nuisance, a public nuisance does not necessarily involve interference with use and enjoyment of land"). Accordingly, the trial court did not erroneously exercise its discretion when it utilized an instruction that contrasted a private nuisance with a public nuisance.

*b. Intentional and unreasonable conduct.*

¶ 47. In addition, the City argues that the trial court erred when it told the jury that NL Industries intentionally created the public nuisance only if its conduct was both intentional *and* unreasonable. According to the City, by giving this instruction, the trial court required it to prove an additional, nonessential element, i.e., unreasonableness, to prevail on its intentional public nuisance claim. Furthermore, the City argues that the intentional conduct instruction and correlating verdict question were inconsistent with the applicable law.

¶ 48. The parties agree that the unreasonableness of the invasion or the interference is a consideration in determining the existence of a public nuisance. NL Industries, however, also contends that the unreasonableness of its conduct is a relevant consideration. The City disagrees, arguing that "[n]o Wisconsin court has articulated the intentional creation of a public nuisance as requiring an element of 'unreasonable' *conduct* separate and apart from the requisite knowledge regarding the harm and the unreasonableness or seriousness of the *interference*." (Emphasis in brief.)

¶ 49. In addition to citing restatement provisions, the City again relies on language in *Vogel* to support its

position; here, that it is the invasion or harm that must be found unreasonable, not the conduct. *See* RESTATE-MENT (SECOND) OF TORTS §§ 821B & 822(a).[12] The *Vogel* court wrote:

> "To be 'intentional,' an invasion of another's interest in the use and enjoyment of land, or of the public right, need not be inspired by malice or ill will on the actor's part toward the other. An invasion so inspired is intentional, but *so is an invasion that the actor know-ingly causes in the pursuit of a laudable enterprise without any desire to cause harm.* It is the knowledge that the actor has at the time he acts or fails to act that determines whether the invasion resulting from his conduct is intentional or unintentional."

*Id.*, 201 Wis. 2d at 430 (emphasis added; quoting RE-STATEMENT (SECOND) OF TORTS § 825 cmt. c). Given that the pursuit of a laudable enterprise, which presumably relates to reasonable conduct, can form the basis for nuisance liability, the City argues that the special

[12] The RESTATEMENT (SECOND) OF TORTS § 821B defines a public nuisance as "an unreasonable interference with a right common to the general public."

The RESTATEMENT (SECOND) OF TORTS § 822(a) states, in relevant part: "One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is . . . intentional and unreasonable." In *State v. Deetz*, 66 Wis. 2d 1, 16 n.6, 224 N.W.2d 407 (1974), our supreme court made clear that although the RESTATEMENT (SECOND) OF TORTS § 822 refers only to private nuisance, the law of public nuisance is the same. *See also Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*, 2005 WI 8, ¶ 46, 277 Wis. 2d 635, 691 N.W.2d 658 ("[S]ince the principal difference between a public and private nuisance lies in the nature of the interest violated or affected by the wrongful conduct, the elements required to establish liability for either are virtually identical.").

verdict question requiring the jury to find NL Industries intentionally and unreasonably engaged in conduct causing the public nuisance was in error. *See also* 58 AM. JUR. 2D *Nuisances* § 10 ("[A]s distinguished from negligence liability, liability in nuisance is predicated upon an unreasonable injury rather than upon unreasonable conduct." (Footnote omitted.)).

¶ 50. Reaching a different conclusion, NL Industries cites *Stunkel v. Price Electric Cooperative*, 229 Wis. 2d 664, 670–71, 599 N.W.2d 919 (Ct. App. 1999), where the court stated: "Lawful conduct that interferes with another's rights may be actionable in nuisance in those cases where intentional but unreasonable conduct is asserted as the underlying basis for a nuisance claim." *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 822(a)). Likewise, in *Crest Chevrolet-Oldsmobile-Cadillac, Inc. v. Willemsen*, 129 Wis. 2d 129, 136, 384 N.W.2d 692 (1986), where an automobile dealership brought an action alleging private nuisance against an adjoining landowner, our supreme court described the issue before it as follows: "[The adjoining landowner] requests this court to review the court of appeals' determination that its conduct was unreasonable." There, in the context of considering whether a social utility analysis was required pursuant to the RESTATEMENT (SECOND) OF TORTS § 826, the court stated: "[A] fact finder must still determine the reasonableness of an actor's conduct in relation to the plaintiff, even if the conduct has social utility." *Crest*, 129 Wis. 2d at 144. Based on the quoted language in the foregoing cases, NL Industries argues that reasonableness applies to an actor's conduct.

¶ 51. The City interprets *Crest*'s holding differently, claiming that it makes clear that the unreasonableness inquiry relates to the harm caused by the conduct, as opposed to the conduct itself. As the City points out, the RESTATEMENT (SECOND) OF TORTS § 826(b),

discussed in *Crest*, provides: "An intentional invasion of another's interest in the use and enjoyment of land is unreasonable if . . . the harm caused by the conduct is serious and the financial burden of compensating for this and similar harm to others would not make the continuation of the conduct not feasible." In applying § 826(b), the *Crest* court held:

> Because we find that Crest [the automobile dealership] suffered serious harm caused by the intentional invasion of surface water stemming from Bauer Glass's [the adjoining landowner] conduct and because compensating for the harm sustained would not have rendered completion of the project infeasible, we find that the invasion of surface water caused by Bauer Glass's conduct was unreasonable.

*Crest*, 129 Wis. 2d at 143–44.

¶ 52. As evidenced by the varying positions of the parties, there is conflicting law on this issue, which may be due in part to inadvertent use of the term "unreasonable" in relation to conduct and interference or invasion. For purposes of this appeal, resolution of the conflict is unnecessary. We conclude that even if the wording of the instruction and verdict question were in error, it was harmless given that the jury answered in the negative the negligence question on the special verdict. *See* Wis. Stat. § 805.18(2).

¶ 53. The negligence question did not include the word "unreasonable." It read: "Did NL Industries negligently engage in conduct that was a cause of the public nuisance?" Inasmuch as the jury did not find that NL Industries was negligent, which requires a lesser showing of culpability than does a showing that NL Industries acted with intent, we do not find the addition of "unreasonable" in the language of the special verdict question on intentional conduct to have been pivotal.

*c. The public nuisance "at issue."*

¶ 54. The City argues that the trial court erred when it instructed the jury that NL Industries' conduct was intentional "if it intended to create the public nuisance *at issue in this case,* or if it knew that its conduct was substantially certain to cause such a nuisance." (Emphasis in brief.) The City contends it was prejudiced by the specificity the instruction required.

¶ 55. Although the City claims to have objected to this language "as requiring a showing the NL [Industries] had perfect contemporaneous foresight of the exact type of problems Milwaukee would eventually face as opposed to knowledge that substantial harm would occur," it does not provide a record citation to substantiate that an objection was timely and properly made during the instruction and verdict conference. *See* WIS. STAT. § 805.13(3).[13] The City cites its memorandum regarding proposed verdict questions and jury instructions, but § 805.13(3) requires that counsel "stat[e] the grounds for objection with particularity on the record."

---

[13] WISCONSIN STAT. § 805.13(3) provides:

 **(3)** INSTRUCTION AND VERDICT CONFERENCE. At the close of the evidence and before arguments to the jury, the court shall conduct a conference with counsel outside the presence of the jury. At the conference, or at such earlier time as the court reasonably directs, counsel may file written motions that the court instruct the jury on the law, and submit verdict questions, as set forth in the motions. The court shall inform counsel on the record of its proposed action on the motions and of the instructions and verdict it proposes to submit. Counsel may object to the proposed instructions or verdict on the grounds of incompleteness or other error, stating the grounds for objection with particularity on the record. *Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict.*

(Emphasis added.)

With a record consisting of two files and nine separate boxes, and with a jury instruction conference that took place for just over two days, appropriate record citations are critical to our review. In the absence of such citations, we need not consider this issue further. *See* WIS. STAT. RULE 809.19(1)(d) & (e); *see also Ford Motor Co. v. Lyons*, 137 Wis. 2d 397, 453, 405 N.W.2d 354 (Ct. App. 1987) ("[I]t is not our obligation to extensively sift the enormous record for facts supporting or discrediting the position of any party on any issue.").

¶ 56. Notwithstanding, we agree with the trial court's decision denying the City's motion for a new trial on this issue because "there is no material difference in meaning between the court's instruction and the City's request." In its memorandum submitting proposed verdict questions and jury instructions, the City requested an instruction providing, in relevant part: "NL industries acted intentionally if it acted for the purpose of creating *a public injury or harm* or knew that *such a public injury or harm* was resulting or was substantially certain to result from its conduct." (Underlining in original.) The City's reference to "a public injury" was essentially synonymous with the definition of public nuisance provided in the jury instructions, which read: "A public nuisance is a condition that unreasonably interferes with a right common to the general public. *A public nuisance requires an injury to the community or the general public* . . . ." (Emphasis added.) The trial court appropriately exercised its discretion in fashioning this jury instruction.

*d. Continued conduct and subsequent knowledge.*

¶ 57. The City next contends that the trial court erred when it declined to adopt its proposed instruction

regarding continued conduct and subsequent knowl-
edge, which it claims was especially important in this
case "where the jury was required to consider a lengthy
time period during which the state of knowledge on the
subject of childhood lead paint poisoning changed." The
City's proposed instruction read: "NL's conduct meets
this intentional standard, even if it was not substan-
tially certain that harm would result when its conduct
began, but NL continued its activities after learning
that harm was substantially certain to result from its
conduct." The City based this proposed instruction on
the RESTATEMENT (SECOND) OF TORTS § 825 cmt. d, which
explains what constitutes an intentional invasion and
in a comment states: "[T]he first invasion resulting
from the actor's conduct may be either intentional or
unintentional; but when the conduct is continued after
the actor knows that the invasion is resulting from it,
further invasions are intentional."

¶ 58. In arguing that the trial court properly
rejected this instruction, NL Industries cites the com-
ment in its entirety:

> d. *Continuing or recurrent invasions.* Most of the
> litigation over private nuisances involves situations in
> which there are continuing or recurrent invasions
> resulting from continuing or recurrent conduct; and
> the same is true of many public nuisances. In these
> cases the first invasion resulting from the actor's con-
> duct may be either intentional or unintentional; but
> when the conduct is continued after the actor knows
> that the invasion is resulting from it, further invasions
> are intentional.

RESTATEMENT (SECOND) OF TORTS § 825 cmt. d. According
to NL Industries, the circumstances referenced in com-
ment d typically arise "when the defendant's conduct is
contemporaneous with the asserted interference, such

as odor emanating from an egg farm or smoke blowing from a factory." *Cf. id.*, illus. 1.-4.[14] In contrast to these circumstances, NL Industries argues it was selling lead pigment and paint at least twenty years prior to the nuisance involved in this case.

¶ 59. The City contends that our statement in *Northridge Co. v. W.R. Grace & Co.*, 205 Wis. 2d 267,

---

[14] The illustrations for the RESTATEMENT (SECOND) OF TORTS § 825 depict the following scenarios:

1. A owns and occupies a house and lot adjacent to a house and lot owned and occupied by B. While B is entertaining guests in his house A, who has a grudge against B, builds a bonfire on his premises with substances that he knows will emit foul-smelling smoke. A knows that the wind will blow this smoke into B's house, and A's only purpose in building the fire is to annoy B. The smoke is blown in B's house, rendering it virtually uninhabitable for several hours. The invasion of B's interest in the use and enjoyment of his land is intentional. 2. A owns land on which he erects and starts to operate a factory. B owns land 200 yards from A's factory, on which he operates a poultry farm. A small stream flows across A's land and then onto B's land. B utilizes this stream in his poultry business. A, wishing to dispose of ten barrels of waste matter from his factory and knowing that the pollution of the stream will interfere with the operation of B's poultry farm, but having no desire to harm B, dumps the waste matter into the stream. This fouls the water for several days and causes a substantial interference with B's poultry business. The invasion of B's interest in the use and enjoyment of his land is intentional. 3. The same facts as in Illustration 2, except that there is no stream on A's or B's land. B gets water for his poultry business from a well on his land, and A dumps the waste matter into a depression on his land, from which it seeps into the ground and is carried 300 yards underground to B's well by a flow of percolating water unknown to A. The water in B's well is contaminated so that it cannot be used in his poultry business for some time. The invasion of B's interest in the use and enjoyment of his land is not intentional. 4. The same facts as in Illustration 3, except that after learning of the pollution of B's well A continues to dump waste into the same depression, which causes further pollution of the well and more interference with B's poultry business. These further invasions of B's interest in the use and enjoyment of his land are intentional.

282, 556 N.W.2d 345 (Ct. App. 1996), "that manufacturers can be liable for nuisance long after they relinquish ownership or control over their polluting products," refutes NL Industries' argument. This statement, made in the context of affirming a jury's finding that an asbestos manufacturer was liable for nuisance, is inapposite to the case before us. The issue here was not whether NL Industries could be held liable for a nuisance after it relinquished ownership or control over its lead pigment and paint. Instead, the trial court was asked to determine whether an instruction on "[c]ontinuing or recurrent invasions" was appropriate where the evidence reflected that the nuisance was unknown to NL Industries until after its conduct had ceased. We conclude that the trial court appropriately exercised its discretion in not giving the City's requested instruction.

*e. Agency.*

¶ 60. The City argues that the trial court erred when it declined to give the City's proposed instruction to the jury regarding NL Industries' purported agency relationship with the Lead Industries Association, an industry trade group. The City's proposed instruction titled "attribution of statements," provided in part:

> You have heard evidence that the LIA was an unincorporated association until 1961. Under the law, this unincorporated association, prior to its incorporation in 1961, had no existence apart from its members. As such, any statements made by this trade group prior to its incorporation are attributable to NL as a member of the association, and you should treat them as such.

¶ 61. The trial court concluded that an instruction on the issue was unnecessary, because in its view

this case did not involve agency law. At the jury instruction conference, the court explained:

> I found a sufficient foundation to allow a jury to consider this evidence, but I believe it's still up to the jury to listen to argument and weigh all the evidence and decide what to make out of the LIA statements, what weight to give them, whether NL is responsible for one or more or all of these statements.
>
> Since, for the most part, these were not statements offered for real truth content and, in my judgment, were primarily helpful in assessing what some people might have known in 1940, for example, based on what a different person knew; that is, what a company knew based on evidence about what a trade association knew. No real agency finding was necessary for that link to exist or for that purpose to be important.
>
> . . . I think the jury can use its common sense and sort this out.
>
> . . . .
>
> . . . [Y]ou're free to argue the reasonable inferences from the evidence the jury has heard.

In its decision denying the City's request for a new trial, the trial court further explained that the statements at issue "were not material to liability-forming conduct and it was not necessary for the jury to determine whether NL was 'responsible' for such . . . statements."

¶ 62. The City contends that because NL Industries had destroyed most of its records, the testimony offered by the historians at trial regarding their understanding of the time period and NL Industries' knowledge was largely dependent on trade associations "NL founded and controlled." NL Industries, in response, argues the conditions needed to prove the existence of

an agency relationship were not established at trial, *see* Wis JI-Civil 4000;[15] specifically, that the Lead Industries Association's actions were subject to NL Industries' direction and control. We agree and conclude that the trial court appropriately exercised its discretion in denying the City's request for instructions related to this issue of agency.

2. Admissibility of evidence.

¶ 63. The City claims it was prejudiced when the trial court allowed the following evidence to be presented to the jury: (1) collateral source evidence; (2) evidence related to the utility of lead paint; and (3) evidence related to product identification and property maintenance.

¶ 64. A trial court has broad discretion in determining the relevance and admissibility of evidence and its decision will not be reversed absent an erroneous exercise of that discretion. *See State v. Oberlander*, 149 Wis. 2d 132, 140–41, 438 N.W.2d 580 (1989). "[T]he question on appeal is not whether this court, ruling initially on the admissibility of the evidence, would have permitted it to come in." *State v. Stinson*, 134

---

[15] Wisconsin JI-Civil 4000 provides in relevant part:

An agency is based on an agreement between the parties which embodies three factual elements:

(1) the conduct of the principal showing that the agent is

to act for him or her;

(2) the conduct of the agent showing that he or she accepts the undertaking;

(3) the understanding of the parties that the principal is

to control the undertaking.

Wis. 2d 224, 232, 397 N.W.2d 136 (Ct. App. 1986). Rather, we "will uphold a decision to admit or exclude evidence if the [trial] court examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion." *Martindale v. Ripp*, 2001 WI 113, ¶ 28, 246 Wis. 2d 67, 629 N.W.2d 698. Thus, we will not find an erroneous exercise of discretion if there is a rational basis for the trial court's decision. *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983).

 *a. Collateral source evidence.*

 ¶ 65. The City contends that the trial court erred in denying its motion *in limine* to preclude NL Industries from presenting evidence to the jury regarding the collateral sources of funds (e.g., federal and state grants) that the Milwaukee Health Department received to help finance its abatement and prevention programs. Although we agree with the City that the admission of evidence of collateral sources of funds was error, we nevertheless conclude the error was harmless in light of the trial court's curative instruction. *See* Wis. Stat. § 805.18(2).

 ¶ 66. The collateral source rule ensures that "[t]he tortfeasor who is legally responsible for causing injury is not relieved of his obligation to the victim simply because the victim had the foresight to arrange, or good fortune to receive, benefits from a collateral source for injuries and expenses." *Ellsworth v. Schelbrock*, 2000 WI 63, ¶ 7, 235 Wis. 2d 678, 611 N.W.2d 764. It is both a rule of damages and a rule of evidence. *Leitinger v. Dbart, Inc.*, 2007 WI 84, ¶¶ 28, 30, 302

Wis. 2d 110, 736 N.W.2d 1. "As a rule of damages, 'the collateral source rule denies a tortfeasor credit for payments or benefits conferred upon the plaintiff by any person [or entity] other than the tortfeasor.' " *Id.*, ¶ 28 (citation omitted). Consequently, under the collateral source rule, it is improper to reduce a damage award based on a payment to the plaintiff from a collateral source. *See id.* "As a rule of evidence, the collateral source rule generally precludes introduction of evidence regarding benefits a plaintiff obtained from sources collateral to the tortfeasor." *Id.*, ¶ 30.

¶ 67. The City relies on *Leitinger* to support the proposition that it was prejudiced in terms of both liability and damages when collateral source evidence was improperly admitted.[16] The City points to the *Leitinger* court's statement that "the purpose of the collateral source rule is not to provide the injured person with a windfall, but rather to prevent the tortfeasor from escaping liability because a collateral source has compensated the injured person." *See id.*, ¶ 34. The City also draws our attention to the authorities quoted by the *Leitinger* court in a footnote supporting the proposition that "[t]he collateral source rule protects plaintiffs by guarding against the potential misuse of collateral source evidence to deny the plaintiff full recovery to which he is entitled." *See id.*, ¶ 31 & n.28. In the footnote, the *Leitinger* court first quotes the Alaska Supreme Court's statement in *Loncar v. Gray*, 28 P.3d 928, 933 (Alaska 2001), that "[t]he collateral source rule 'exclud[es] evidence of other compensation on the theory that such evidence would affect the

---

[16] *Leitinger v. Dbart, Inc.*, 2007 WI 84, 302 Wis. 2d 110, 736 N.W.2d 1, was released eleven days after the jury reached its verdict in this case.

jury's judgment unfavorably to the plaintiff on the issues of liability *and* damages.' " *Leitinger*, 302 Wis. 2d 110, ¶ 31 n.28 (emphasis added; one set of internal quotation marks omitted). In the same footnote, *Leitinger* quotes a treatise provision explaining that a justification for the collateral source rule is that " 'the introduction of evidence that the plaintiff received benefits is inherently prejudicial to the plaintiff.' " *Id.* (quoting 1 DAN B. DOBBS, DOBB'S LAW OF REMEDIES: DAMAGES, EQUITY, RESTITUTION § 3.8(1) at 375 (2d ed. 1993)).

¶ 68. In denying the City's motion *in limine,* the trial court explained that the collateral source rule applied and that the jury would be instructed not to reduce a damage award because of payments from a third party that may have been received by the City. The trial court continued, however, to explain its reasoning for allowing such evidence to be offered at trial:

> The general rule, of course, is that evidence shouldn't come in if it's offered for that purpose [of reducing a damage award], but it just seems incredibly impractical to me to think that we're going to try this case without reference to federal programs or federal grants or the jury somehow isn't going to be aware that there was at least a few dollars of state or federal money involved. I can't imagine working with these exhibits for more than a few minutes and somehow redacting them so that the jury doesn't find out about it, and it just seems to me to be totally unnecessary.

As noted, the trial court instructed the jury on the use to be made of the collateral source evidence:

> Evidence in this case has indicated that the City received grants from the federal government or other sources to help pay for some of the costs of its abatement program. However, any issues with respect to the distribution of any damages awarded are not a part of

the jury trial in this matter, and this evidence may not affect you[r] answer to the damage question. You may not reduce your award of damages because the City may have received funds for some costs from another source.

■■

¶ 69. The collateral source rule directly pertains to the recovery of damages; and here, the jury was appropriately instructed that evidence of collateral sources of funding was not to affect the jury's answer to the damage question on the special verdict. *See Koff-man v. Leichtfuss*, 2001 WI 111, ¶ 29, 246 Wis. 2d 31, 630 N.W.2d 201 ("The [collateral source] rule is grounded in the long-standing policy decision that should a windfall arise as a consequence of an outside payment, the party to profit from that collateral source is 'the person who has been injured, not the one whose wrongful acts caused the injury.' " (citation omitted)). "Where the trial court gives the jury a curative instruction, . . . the appellate court may conclude that such instruction erased any possible prejudice, unless the record supports the conclusion that the jury disregarded the trial court's admonition." *Genova v. State*, 91 Wis. 2d 595, 622, 283 N.W.2d 483 (Ct. App. 1979); *see also State v. Truax*, 151 Wis. 2d 354, 362, 444 N.W.2d 432 (Ct. App. 1989) ("We presume that the jury follows the instructions given to it.").

¶ 70. Here, there is no basis in the record, other than one that calls for speculation, to support the conclusion that the collateral source evidence affected the jury's liability findings. The City introduced and relied on such evidence extensively after its motion *in limine* was denied. The City claims it was "forced to disclose the existence of collateral sources in the process of making its *prima facie* case for damages" as a

result of the denial. Even if we accept this argument, as noted above, the curative instruction remedied any possible prejudice; and, since the evidence was offered by the City to make its *prima facie* case *for damages,* we fail to see how it would have affected the jury's liability findings. In addition, we are not convinced that NL Industries improperly used the City's evidence of funding sources; instead, NL Industries merely responded to the evidence presented by the City.[17] *See State v. Richardson,* 2001 WI App 152, ¶ 11, 246 Wis. 2d 711,

---

[17] Counsel for the City asserted during oral argument that NL Industries used the collateral source evidence to argue during closing that the City was not a "worthy plaintiff." This assertion presumably is based on the following statements by NL Industries' counsel during closing argument at trial:

> [T]he City doesn't really begin [its abatement program] until about 1992 [because this] is the time when their first federal grant money became available to do this. That's why they waited.
>
> Amy Murphy [the City's witness] testified that the funding initially for the project was in 1992, which is [by the] CDC [i.e., Centers for Disease Control]. And it's still ongoing. They're still receiving this funding. So it began because they had federal funding to do it.
>
> Then, as they added up different projects, you wonder, well, is [sic] the City's expenditures coming out of other city needs, like part of the city budget is being used for the childhood lead program. Well, no. Ms. Murphy testified that these projects are all conditional on using it specifically for this project, for childhood lead poisoning.
>
> So this is all earmarked money coming in – earmarked money coming in for lead-paint poisoning conditional on being used for that purpose, so it's not diverted from the rest of the [C]ity's needs . . . .
>
> . . . .
>
> The City made an important choice. It wasn't going to enforce the law against landlords. Instead, it was going to subsidize the replacement or refurbishment of windows. Why? Because they had

632 N.W.2d 84 ("When a party opens the door on a subject, he cannot complain if the opposing party offers evidence on the same subject to explain, counteract, or disprove the evidence.").

### b. Utility of lead paint.

¶ 71. Next, the City contends that the trial court erred in denying its motion to exclude evidence of or argument related to the utility or usefulness of lead paint. Likewise, the City claims that the trial court erred in denying its request for an instruction informing the jury that it should not consider the alleged utility of lead paint. The City's argument is based on the premise that the social utility of nuisance-causing conduct is irrelevant in a cause of action for damages.

¶ 72. In response, NL Industries denies it offered the evidence for the purpose of balancing the utility of the paint against the consequences of the presence of lead paint in Milwaukee homes; instead, it contends the evidence was offered in its effort to show that it did not act tortiously. In addition, NL Industries argues that the City waived this argument during the jury instruction conference when counsel for the City stated: "[W]e

a funding source willing to pay for that. And so they made that choice not to enforce but to subsidize.

. . . That's what the City chooses to do. It has a funding source willing to pay for it, so that's their program.

Many of the comments were made in response to evidence offered by the City and as such, were not improper. In addition, as previously stated any prejudicial effect these comments may have had regarding damages was remedied by the curative instruction. *See Genova v. State*, 91 Wis. 2d 595, 622, 283 N.W.2d 483 (Ct. App. 1979).

491

would request the Court to respectfully consider inclusion, under 'unreasonable,' the fact that they may find that invasion is unreasonable depending upon the gravity of the harm outweighing the utility of the actor's conduct, or that the harm caused by the conduct is serious."

¶ 73. The City did not reply on this issue, and we, therefore, do not address it further. *See Fischer v. Wisconsin Patients Comp. Fund*, 2002 WI App 192, ¶ 1 n.1, 256 Wis. 2d 848, 650 N.W.2d 75 ("An argument asserted by a respondent on appeal and not disputed by the appellant in the reply brief is taken as admitted.").

*c. Product identification and property maintenance.*

¶ 74. The City also sought to exclude evidence related to a lack of property maintenance or product identification based on its contention that such evidence was irrelevant to the creation of the alleged public nuisance. The trial court denied the City's motion and its proposed jury instruction on the issue, which the City claims was error. The City relies on our earlier decision to support its argument. *See NL Industries I*, 278 Wis. 2d 313, ¶¶ 14–15 (agreeing with the City that identification of the specific lead pigment or paint contained in the houses being abated was unnecessary to prove causation).

¶ 75. In response, NL Industries asserts that evidence related to property maintenance and the lack of product identification was properly admitted to show the following: that the presence of lead-based paint, absent surface deterioration, does not unreasonably interfere with a public right; that its sales and promotion of lead pigment and paint in Milwaukee did not

cause the alleged public nuisance; and that tortious conduct on the part of landlords and the City itself caused and/or contributed to the alleged public nuisance.[18]

---

[18] Citing a memorandum filed in opposition to its motion *in limine,* the City claims NL Industries conceded that it did not intend to argue about any lack of property-specific product identification but then proceeded to cross-examine one of its witnesses on the issue and to address the point in its closing argument. In the memorandum, NL Industries wrote:

> NL does not intend to offer proof that NL's lead pigment was [not] on any specific window that the City has abated, or will abate in the future. At the same time, NL fully anticipates presenting, as the City acknowledge [sic] it may, evidence concerning whether causation of any public nuisance is due to the impacts of [NL's] sales and promotional conduct on the community.

(Brackets in original; citations and internal quotation marks omitted.) The City does not direct us to any such evidence *offered by* NL Industries.

However, as the Dissent points out, during cross-examination of a witness, NL Industries inquired whether the City ever attempted to determine the entity responsible for making or selling the lead it argued was present in Milwaukee homes. In addition, during closing argument, counsel for NL Industries stated:

> They [the City] do that [i.e., try to shift the costs of the abatement program] without ever trying to find out if our product, Dutch Boy, is in any of those homes, doing very little to find out if it's really lead paint in those homes or if there are lead hazards.
>
> . . . .
>
> . . . The City says take all of their expense in this whole program, and all but 0.74 they say goes to paint, and that, therefore, goes to NL. That's their claim to you. And yet we know, most of the time, they aren't even looking for another source.

These statements were made in the context of NL Industries' argument that the City was improperly attributing nearly all of

¶ 76. We disagree with the City that our previous ruling precluded NL Industries from making arguments based on product identification and property maintenance. The fact that the City was not required to prove identification of the specific lead pigment and paint to establish causation, did not make the lack of such identification off-limits to NL Industries where the City sought to hold NL Industries responsible for all of its abatement costs. We conclude the trial court properly exercised its discretion in deeming this evidence admissible.

3. NL Industries' claims related to recklessness, conspiracy, and future costs.

¶ 77. Finally, the City argues that the trial court erred when it dismissed the City's nuisance claim based

the costs of its abatement program to lead paint, when there were other sources of lead that were not explored. To support its argument, NL Industries highlighted evidence offered by the City to substantiate its claims for damages, which read in part:

Since its inception, the Childhood Lead Poisoning Prevention Program has spent its resources addressing lead hazards caused by the presence of lead paint. During the 15–year tenure of the program, there have been *exceptional* instances in which the Program investigated non-paint sources of lead . . . . As such, approximately 0.74 percent of the Program's resources have been expended on nonpaint sources of lead. This amount is deducted from the subtotal of the past damages figure.

(Emphasis added.)

While comments were made regarding the lack of product identification, NL Industries never argued that the City was required to prove that NL Industries' lead pigment or paint was present in order to prevail on its claims. Instead, it appears NL Industries' argument related to whether its sales and promotion of lead pigment and paint in Milwaukee caused the alleged public nuisance, or whether it could be the result of other non-paint sources of lead.

on reckless conduct; in its formatting of the special verdict related to the City's conspiracy claim; and when it granted summary judgment to NL Industries on the City's requested future abatement costs.

*a. Reckless conduct liability.*

¶ 78. As stated, at the close of the City's case-in-chief, NL Industries moved to dismiss, among other claims, the City's claim that NL Industries recklessly created the alleged public nuisance. The trial court granted NL Industries' motion based on its conclusion that the evidence was insufficient to permit a reasonable jury to find that the elements of a nuisance claim based on reckless conduct were proven.

¶ 79. The standard we use to review the trial court's grant of NL Industries' motion to dismiss the City's nuisance claim based on reckless conduct was recently set forth by our supreme court in *Berner Cheese Corp. v. Krug*, 2008 WI 95, ¶ 36, 312 Wis. 2d 251, 752 N.W.2d 800. There, the court stated:

> A motion to dismiss a claim based on insufficiency of the evidence adduced at trial may be granted when a court "is satisfied that, considering all credible evidence in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such a party." *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 388, 541 N.W.2d 753 (1995); *see also* WIS. STAT. § 805.14(1). We have explained that we will "not overturn a [trial] court's decision to dismiss for insufficient evidence unless the record reveals that the [trial] court was 'clearly wrong.'" *Id.* at 389, 541 N.W.2d 753 (citing *Helmbrecht v. St. Paul Ins. Co.*, 122 Wis. 2d 94, 110, 362 N.W.2d 118 (1985)). We read the "clearly wrong" standard and the "no credible evidence" standard together,

such that when a [trial] court dismisses a claim that is supported by any credible evidence, its decision is "clearly wrong." *Id.*

*Berner Cheese Corp.*, 752 N.W.2d 800, ¶ 36.

¶ 80. In its two-paragraph argument on this issue, the City does not address whether its reckless conduct claim was supported by credible evidence such that the trial court's decision was "clearly wrong." *See id.* Instead, the City argues that because reckless conduct is a lesser standard than intentional conduct, it was prejudiced when the trial court precluded the jury from considering this claim. *See* RESTATEMENT (SECOND) OF TORTS § 500 cmt. f.[19]

¶ 81. Recklessness, however, requires a greater showing of culpability than negligence, and here the jury found that there was no negligent conduct on the part of NL Industries. The City did not appeal the jury's finding in this regard. As a result, we fail to see how the trial court's decision to dismiss the City's public nuisance claim based on reckless conduct can be deemed to have been in error.

*b. Conspiracy.*

■■

¶ 82. The City argues that the trial court erred when it instructed the jury to answer question four on

---

[19] RESTATEMENT (SECOND) OF TORTS § 500 cmt. f provides, in relevant part:

> While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it. It is enough that he realizes or, from facts which he knows, should realize that there is a strong probability that harm may result, even though he hopes or even expects that his conduct will prove harmless. However, a strong probability is a different thing from the substantial certainty without which he cannot be said to intend the harm in which his act results.

496

the special verdict form, "Did NL Industries engage in a conspiracy with one or more others that was a cause of the public nuisance," only if the jury had previously found that NL Industries either "intentionally and unreasonably," or "negligently" "engage[d] in conduct that was a cause of the public nuisance." *See supra* ¶ 17 n.5. The City claims that it was prejudiced because the format of the special verdict precluded the jury from considering NL Industries' vicarious liability related to acts it promoted but did not commit. *See Segall v. Hurwitz*, 114 Wis. 2d 471, 481, 339 N.W.2d 333 (Ct. App. 1983) ("A conspiracy may produce one or more torts. If it does, then every conspirator is liable for that tort, including a conspirator who promoted but did not commit the tort.").

¶ 83. Trial courts are vested with "wide discretion in determining the words and form of a special verdict." *Gumz v. Northern States Power Co.*, 2007 WI 135, ¶ 23, 305 Wis. 2d 263, 742 N.W.2d 271. We will only disturb the trial court's drafting of a special verdict where "the special verdict questions fail to cover all issues of fact or are inconsistent with the law." *Id.*, ¶ 24. We review *de novo* "[w]hether a special verdict reflects an accurate statement of the law applicable to the issues of fact in a given case." *Id.*

¶ 84. As NL Industries argues in its brief, the City has not appealed the trial court's jury instruction on conspiracy. In relevant part, the instruction provided: "A conspiracy is a combination of two or more persons acting together to accomplish some unlawful purpose or to accomplish some lawful purpose by unlawful means. The essence of the conspiracy alleged here is a combination or agreement which had as its purpose the creation of a public nuisance." NL Industries writes:

497

The jury's resolution of Special Verdict Questions 2 and 3 in the negative foreclosed a finding of conspiracy under this instruction.

First, the jury's determination on Question 2 that NL [Industries] did not "act for the purpose" of creating the public nuisance foreclosed a finding that NL [Industries] entered into a conspiracy, the purpose of which was the creation of a public nuisance. The City does not suggest otherwise.

Second, the jury's determination that NL [Industries'] sale and promotion of lead-pigment and lead-based paint was not negligent foreclosed a finding that NL entered into a "tortious" or "unlawful" agreement with others to sell and promote those products.

We agree.

¶ 85. Under the conspiracy instruction given, which is not at issue on appeal, a "yes" response to question four would have resulted in an inconsistent verdict given the jury's answers to questions one and two. Consequently, we conclude that the trial court did not err in its formatting of the special verdict as to the City's conspiracy claim.

*c. Future abatement costs.*

■■■

¶ 86. The City argues that the trial court erred in granting NL Industries' motion for partial summary judgment as to the City's requested future abatement costs. The issue of future costs is moot in light of the jury's findings that NL Industries is not liable and we do not address it further.[20]

---

[20] Following the submission of its response brief, NL Industries submitted two subsequently released non-Wisconsin cases

*By the Court.*—Judgment affirmed.

¶ 87. KESSLER, J. (*dissenting*). I respectfully dissent. In my view, the City is entitled to a new trial because errors of law in the admission of evidence and errors of law in the jury instructions render the verdict unreliable. Because these errors of law caused the jury to deliberate with substantial information it should not have had, based on instructions which misstated the law, the City is entitled to a new trial.

---

for our review, *Rhode Island v. Lead Industries Ass'n*, 951 A.2d 428 (R.I. 2008), and *Smith v. 2328 University Avenue Corp.*, 52 A.D.3d 216 (N.Y. App. Div. 2008). We agree with the City that these cases are not pertinent to the issues in this case.

In *Lead Industries Ass'n*, the Rhode Island Supreme Court reversed a verdict imposing liability on lead pigment manufacturers for creating a public nuisance based on its conclusion that the state of Rhode Island could not "allege any set of facts to support its public nuisance claim that would establish that defendants interfered with a public right or that defendants were in control of the lead pigment they, or their predecessors, manufactured *at the time* it caused harm to Rhode Island children." *Id.*, 951 A.2d at 435. In contrast, in our previous decision holding that genuine issues of material fact precluded summary judgment in NL Industries' favor, we concluded that a public nuisance claim was validly pled in this case. *See City of Milwaukee v. NL Indus., Inc.*, 2005 WI App 7, ¶ 1, 278 Wis. 2d 313, 691 N.W.2d 888 (Ct. App. 2004). Furthermore, the *Lead Industries Ass'n* court's discussion of public nuisance law in Rhode Island, which encompasses different elements than Wisconsin's public nuisance law—namely, an element of control—is irrelevant to the issues presented in this appeal. *See Lead Indus. Ass'n*, 951 A.2d at 435, 446, 449–50. Likewise, the *Smith* court's decision to reverse a lower court's denial of NL Industries' motion to dismiss based on New York product liability law is inapposite given that the City's claims at issue here involve nuisance law, not product liability law. *See id.*, 52 A.D.3d at 216.

499

## I. Collateral source evidence.

¶ 88. One of the most significant errors in this case was the admission of evidence that the Milwaukee Health Department received federal and state grants to help finance its abatement and prevention programs. *See* majority op., ¶¶ 65–70. I agree with the Majority that the trial court erroneously exercised its discretion when it denied the City's motion in limine to exclude this collateral source evidence. *See id.* However, I disagree with the majority's conclusion that the trial court's curative instruction rendered this error harmless. *See id.*, ¶¶ 65, 70. Rather, I conclude that the error affected the substantial rights of the City, *see* WIS. STAT. § 805.18(2), because there is a "reasonable possibility that the error contributed to the outcome" of the trial. *See Martindale v. Ripp*, 2001 WI 113, ¶ 32, 246 Wis. 2d 67, 629 N.W.2d 698. Therefore, I conclude that the City is entitled to a new trial.

¶ 89. The admission of the collateral source evidence allowed NL Industries to argue, in effect, that the City was not a worthy plaintiff. In closing argument, NL Industries emphasized to the jury that the City did not undertake the abatement until federal funds were provided (implying the need was not important enough until the City could abate the problem for free), and that the City's other programs did not suffer any financial impact because the grants paid for the abatement project (implying there were no damages that needed to be awarded). *See* majority op., ¶ 70 n.17. At closing argument, NL Industries' counsel told the jury that the City's abatement program was an "experiment" that replaced windows as a means of reducing lead poisoning. Counsel then stated:

Now, it's unfair to NL. The City's entitled to experiment with HUD all they want, but . . . they chose the high-cost approach; they chose to do it by subsidies because they had a funding source to do it, where they've worked to spend all the available money from that funding source, and then try to shift all that over to my company, alone out of the whole world, just shift it over to us.

¶ 90. In making these arguments, NL Industries invited the jury to find in its favor not just on damages, but also on liability, because the City benefitted from a collateral source. This is precisely what the collateral source rule is designed to prevent. *See Leitinger v. DBart, Inc.*, 2007 WI 84, ¶¶ 33–34, 302 Wis. 2d 110, 736 N.W.2d 1 (collateral source rule aims at deterring tortfeasor's negligent conduct and prevents "tortfeasor from escaping liability because a collateral source has compensated the injured person."). NL industries should not have been permitted to invite jury bias in its favor by talking about the grant money the City received. *See Town of East Troy v. Soo Line Ry. Co.*, 653 F.2d 1123, 1132 (7th Cir. 1980) (analyzing application of Wisconsin's collateral source rule in public nuisance case involving funding received from the U.S. Department of Housing and Urban Development and concluding that tortfeasor "was properly prevented from possibly creating jury bias in its favor by mentioning or producing evidence of the HUD grant to the Town.").

¶ 91. The majority concludes that the trial court's curative instruction remedied the erroneous admission of the collateral source evidence. I disagree. If any curative instruction could dissipate the taint of erroneously admitted collateral source evidence, the curative instruction given in this case did not do that. The instruction told the jury that

any issues with respect to the distribution of any damages awarded are not a part of the jury trial in this matter, and this evidence *may not affect you[r] answer to the damage question.* You may not reduce *your award of damages* because the City may have received funds for some costs from another source.

*See* majority op., ¶ 68 (emphasis added).

¶ 92. Significantly, this instruction prohibited the jury from considering outside funds when it considered damages, but did not instruct the jury that it must not consider the evidence of grants in *any way* in its determinations. This is problematic because the collateral source rule is not merely a rule of damages, but a rule of evidence. *See Leitinger,* 302 Wis. 2d 110, ¶¶ 28, 30. *Leitinger* explained: "As a rule of evidence, the collateral source rule generally precludes introduction of evidence regarding benefits a plaintiff obtained from sources collateral to the tortfeasor." *Id.,* ¶ 30. Application of the collateral source rule "prevents the factfinder from learning about collateral source payments, even when offered supposedly to assist the jury in determining [some other issue], so that the existence of collateral source payments will not influence the factfinder." *Id.,* ¶ 54.

¶ 93. Consequently, although the jury should not have been permitted to consider the collateral source evidence for *any* purpose, it was allowed to consider it as evidence for any purpose other than damages. Specifically, the jury was free to improperly consider the collateral source evidence when determining liability.

¶ 94. This error was far from harmless. This case did not involve a subtle or innocuous passing reference to collateral sources. Rather, NL Industries was allowed, over the City's objection, to emphasize the collateral sources and argue the City only abated the

502

properties because it was given funds to do so. NL Industries argued vigorously that the City was an unworthy plaintiff. I conclude that the jury instruction did nothing to cure the extremely prejudicial impact on liability of the collateral source evidence and NL Industries' argument thereon which was presented to the jury. There is, at minimum, a reasonable possibility that the jury considered this improper evidence and improper argument in deciding the liability questions. Because the erroneous admission of the collateral source evidence prejudicially affected the City's substantial rights, the City is entitled to a new trial. *See* WIS. STAT. § 805.18(2).

## II. Evidence concerning product identification.

¶ 95. The City sought to exclude evidence related to lack of product identification. *See* majority op., ¶¶ 74–76. The trial court denied the motion. Ultimately, NL Industries was permitted to raise and argue the issue of product identification in a way that contradicts this court's decision in *City of Milwaukee v. NL Industries, Inc.*, 2005 WI App 7, 278 Wis. 2d 313, 691 N.W.2d 888 ("*NL Industries I*"). In that case, we rejected NL Industries' argument that "the City must prove, at a minimum, that NL Industries' pigment or lead paint or Mautz's lead paint is present on windows." *Id.*, ¶ 14. We recognized the City's admission "that, because technology does not make it possible to do so, the City cannot identify the specific lead pigment or paint contained in the houses being abated." *Id.*, ¶ 15. We concluded that it would be up to the jury to decide if NL Industries (and the other defendant) "caused this nuisance by selling lead paint in Milwaukee and promoting

503

its use there" and "the extent and effect of promotion of lead paint sales by both defendants." *Id.*, ¶¶ 18, 19.

¶ 96. Contrary to our holding that NL Industries' potential liability was not based on whether the City could prove that lead which NL Industries produced could be identified in a particular home, NL Industries was permitted to argue that because the City did not prove what we held it did not have to prove, the City should not prevail. NL Industries was allowed to ask the following questions on cross-examination:

> Did the City at any time during the course of its lead program ever make any effort to determine who made the paint, whether it's lead-based paint or not, on the properties in the target area?
>
> . . . .
>
> Did the City ever attempt to determine who made or sold the lead that may or may not have been present in the paint on homes in the target areas?

Then, during closing argument, NL Industries focused much of its argument on the theory that it was improper for the City to abate the lead poisoning using window replacement "without ever trying to find out if our product, Dutch Boy, is in any of those homes, doing very little to find out if it's really lead paint in those homes or if there are lead hazards." This argument implied that the City *could have* determined if it was Dutch Boy paint on a particular home, and that it *should have* done so. This argument contradicted our holding in *NL Industries I*, and flowed from the erroneous denial of the City's motion in limine concerning product identification. Permitting those questions and argument, in direct contradiction of our previous holding, justifies a new trial.

## III. Jury instruction requiring proof both of intent and of unreasonable conduct.

¶ 97. The City argues that the trial court errone-ously asked in the special verdict[1] and erroneously instructed the jury "that NL Industries intentionally created the public nuisance only if its conduct was both intentional *and* unreasonable." *See* majority op., ¶ 47. The court instructed that in order to answer "yes" to this special verdict question, the jury "must be satisfied that NL industries acted intentionally *and* unreason-ably, and that its intentional *and* unreasonable conduct was a cause of the public nuisance." (Emphasis added.) As the majority notes, the parties both find support for their respective positions on this issue in what may well be "conflicting law on this issue." *See id.*, ¶ 52. The majority concludes that resolution of this conflict is unnecessary "given that the jury answered in the nega-tive the negligence question on the special verdict." *Id.* I disagree.

¶ 98. If the City is correct, it is entitled to a new trial because the error was not harmless. Whether the City had to prove NL Industries' conduct was unreason-able, in addition to being intentional, is no minor is-sue: it had profound implications on the evidence re-quired. Using the instructions given, NL Industries argued that the City had to prove that NL Industries knew the precise mechanism of childhood lead poisoning at the time it intentionally sold the lead-based paint in Milwaukee, thus making the conduct "unreasonable" in

---

[1] Question two of the special verdict asked: "Did NL Industries intentionally and unreasonably engage in conduct that was a cause of the public nuisance?"

additional to intentional.[2] This allowed NL Industries to argue that liability could only be premised on its foreknowledge of the exact mechanism of the injuries the affected children suffered. Because NL Industries did not know the ultimate extent to which its product would harm children, it argued, its conduct was not unreasonable. There is a reasonable possibility that this argument, based on the jury instruction, "contributed to the outcome" of the trial. *See Martindale*, 246 Wis. 2d 67, ¶ 32. Thus, if the instruction was erroneous, the City is entitled to a new trial.

[2] It has never been disputed that NL Industries sold lead-based paint in Milwaukee; NL Industries has never claimed that the paint got to Milwaukee accidentally, or without its knowledge. The dispute has centered on what NL Industries knew about the impact of that paint on children.