# COURT OF APPEALS
## DECISION
## DATED AND FILED

## January 18, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.  2021AP1603**

**STATE OF WISCONSIN**

Cir. Ct. No.  2019CV644

**IN COURT OF APPEALS
DISTRICT I**

MID AMERICA STEEL DRUM PROPERTIES, LLC AND 17H LLC,

PLAINTIFFS-RESPONDENTS-CROSS-APPELLANTS,

V.

CONTAINER LIFE CYCLE MANAGEMENT LLC,

DEFENDANT-APPELLANT-CROSS-RESPONDENT.

APPEAL and CROSS-APPEAL from a judgment and an order of the circuit court for Milwaukee County:  LAURA GRAMLING PEREZ, Judge. *Affirmed.*

Before Brash, C.J., Donald, P.J., and White, J.

¶1    BRASH, C.J.  Container Life Cycle Management LLC appeals the judgment and order entered in favor of Mid America Steel Drum Properties, LLC and 17H LLC (collectively, Mid America), upon a jury verdict which found that

Container Life had committed trespass and unlawfully withheld possession of several parcels owned by Mid America, and was unjustly enriched by that conduct. Container Life argued that it thought those parcels were included in a lease it had entered into with Mid America. It therefore filed a counterclaim for reformation of that lease to include one parcel in particular, referred to as the "Trailer Yard," in the lease; that counterclaim was dismissed by the trial court.

¶2 On appeal, Container Life contends that the trial court erred in dismissing its counterclaim to reform the lease. Container Life also asserts that the trial court erroneously exercised its discretion with regard to several issues relating to jury instructions and the special verdict, as well as its denial of Container Life's motion to bifurcate the trial to address the equitable issue of lease reformation prior to addressing the legal claims presented by Mid America.

¶3 Additionally, Mid America cross-appeals regarding its claim for punitive damages. It asserts that the trial court applied the wrong legal standard when it refused to allow the jury to consider whether punitive damages were warranted, based on Container Life's unauthorized use of the parcels.

¶4 Upon review, we conclude that the trial court did not erroneously exercise its discretion in any of the decisions being challenged by Container Life. We also reject Mid America's argument in its cross-appeal that the trial court applied the wrong legal standard in considering its punitive damages claim. Therefore, we affirm.

## BACKGROUND

¶5 Mid America is owned by Michael Higgins and his brother, Timothy. Mid America's business operation involved the reconditioning of steel drums, a

2

process which included stripping, reforming, repainting, and adding new parts to the used containers, and then testing those reconditioned containers. The main operating site where this process was performed is located at 8570 South Chicago Road in Oak Creek.

¶6      To the immediate south of the main operating site is a parcel located on East Puetz Road—the Trailer Yard parcel—which is also owned by Mid America. The Trailer Yard parcel was used by Mid America to store used drums until they could be reconditioned at the main operating site. Additionally, Mid America owned another parcel on South Chicago Road also utilized by the business, known as the "Drop Off Lot."[1]

¶7      Container Life was formed in 2010, and sought to build a national network of drum reconditioners. To that end, it approached the Higginses about purchasing Mid America. In a letter of intent sent to the Higginses in March 2011, Container Life indicated that it wished to purchase the business assets but not the real property associated with the business; rather, the purchase agreement was to include a lease for the real property used by the business. The letter referred to the real estate and other items it was not purchasing, such as some of the equipment, as "Excluded Assets." It further stated that Container Life would conduct due diligence on the Excluded Assets, including the real property, to determine their "value, condition, and fitness … for their intended use" prior to entering into a lease. Michael Higgins understood this to mean that after Container Life reviewed the real property available from Mid America, it would lease the property it thought was

---

[1] Another parcel, located at 2529 East Norwich Avenue in Saint Francis and referred to as the "Kitzinger property," was included in Mid America's complaint. That parcel is owned by 17H LLC, an entity that is also owned by Michael and Timothy Higgins. However, the jury rejected Mid America's claims regarding that parcel, and this appeal does not include any arguments pertaining to that portion of the verdict. We therefore do not discuss that parcel further.

"necessary for the business." Mid America gave Container Life access to its property for approximately thirty months to conduct its due diligence.

¶8 Container Life and Mid America entered into an Asset Purchase Agreement in November 2013.[2] The Agreement included a schedule of real property involved in the transaction, including the "Oak Creek" property, which was defined as "the real estate and improvements thereto located at 8570 South Chicago Road, Oak Creek, Wisconsin." The Agreement further stated that there was a lease for that South Chicago Road property; however, neither the Trailer Yard, nor its address on Puetz Road, were referenced as being part of the leased property.

¶9 The Higginses assumed that this indicated that Container Life had "selected the parcels [it] wanted to lease[,]" which did not include the Trailer Yard. Michael Higgins testified at the trial that as part of its due diligence, Container Life had conducted an environmental analysis on the property and determined that there could be some contamination on the property, particularly at the location of a "chop shop" that was on the Trailer Yard parcel. Michael stated that he had been told "very directly" by Container Life that they did not "want to operate on any contaminated or potentially contaminated property." Therefore, the Higginses presumed that Container Life had decided not to include the Trailer Yard in the lease.

¶10 However, the president of Container Life, Randy Stacy, thought the Oak Creek property, as identified in the Agreement, included the other parcels used by Mid America in its business, particularly the Trailer Yard. This

_____

[2] As part of the sale of Mid America's business assets to Container Life, Michael and Timothy Higgins became partners in Container Life. Michael Higgins remained active in running the business until November 2018.

misunderstanding was shared by "numerous people" at Container Life, including its general counsel and the outside attorneys who drafted the lease.

¶11    Shortly after the Agreement was executed, Michael Higgins told Stacy that Container Life was using parcels it had not leased, including the Trailer Yard. Michael stated that if Container Life was going to continue using these parcels, they would have to "get something worked out in terms of a lease." Stacy agreed; however, no other leases were ever executed.

¶12    Mid America then filed the complaint underlying this appeal in January 2019, alleging that Container Life was trespassing on the Trailer Yard and the Drop Off Lot and claiming that Container Life was being unjustly enriched through its use of those parcels; Mid America sought to eject Container Life from those premises. In response, Container Life filed a counterclaim seeking reformation of the lease to include the Trailer Yard.

¶13    The matter then proceeded to a jury trial in April 2021. Prior to the trial, however, Container Life filed a motion to bifurcate, arguing that its counterclaim for reformation—an equitable claim that must be tried to the court, as opposed to a jury—should be tried first, before the jury trial on Mid America's claims. The trial court denied the motion, noting its concern that hearing the reformation counterclaim first could potentially lead to the court making factual findings on certain issues that overlap with the legal claims of Mid America, which Mid America had the right to put before a jury.

¶14    After the trial had begun, Container Life requested the inclusion of a jury instruction on the duty to speak relating to the Higginses' duty to inform Container Life that the Trailer Yard and Drop Off Lot were separate parcels from the main operating site. The trial court rejected the request as untimely, because it

was not included in Container Life's proposed jury instructions even though this was an argument that it had asserted throughout the litigation of this matter. The trial court further found that the instruction was not necessary because it relates to fraud claims, and there were no fraud claims alleged in this case.

¶15    Also during the trial, Container Life requested that several advisory questions relating to its reformation counterclaim be submitted to the jury. Specifically, the questions proposed by Container Life asked whether either party had made a mistake relating to the property included in the lease, and whether this was a misrepresentation—either willful or innocent—by the Higginses and Mid America.

¶16    The trial court rejected this request as well. It again commented on the lack of timeliness of the request by Container Life since it was being raised in the middle of trial, and these questions had not previously been included with the proposed jury instructions and special verdict forms submitted by the parties prior to the trial. The court further noted that although some additional instructions and verdict questions had been proposed by the parties since the pretrial deadline, those supplemental filings were helpful to "focus and winnow the information for the jury" regarding the legal claims the jury was deciding. However, these proposed special verdict questions regarding Container Life's reformation counterclaim would be "essentially sort of adding an entirely new kind of claim to the issues for the jury to decide midway through the trial," which the court deemed to be inappropriate.

¶17    The trial court further observed that the reformation counterclaim was "reasonably straightforward" and a "pretty typical type of matter that the [c]ourt

makes decisions about all the time." Therefore, the court determined that the proposed advisory jury questions were not "necessary or appropriate."

¶18 Another issue arose at the end of the trial with a pattern jury instruction that was submitted regarding implied consent for the use of the parcels at issue. This instruction, WIS JI—CIVIL 8015, related to Container Life's argument that the Higginses had given implied consent to Container Life for the use of the Trailer Yard and Drop Off Lot. However, the instruction is generally used in tort cases, particularly for personal injury claims by a trespasser against a property owner. *See id.* As a result, the last sentence of the instruction directs the jury that "[i]f, under all the existing circumstances, a reasonable person would conclude that the possessor of the premises impliedly consented that the *plaintiff* be on the premises, then there was consent." *Id.* (emphasis added). As the instruction was being read to the jury, counsel for Container Life realized that for this case, the sentence should have stated that the issue of implied consent related to use of the parcels at issue by the *defendant*—Container Life—not the plaintiff. As such, the trial court substituted "defendant" for "plaintiff" in that sentence, and re-read it to the jury.

¶19 Upon further discussion by the trial court and the parties regarding the instruction, there were two additional instances where the use of the word "plaintiff" was determined to be inaccurate under the circumstances of this case; specifically, where the instruction directs the jury to consider both "the acquiescence of the possessor, if any, in the previous use of the premises by others (including the *plaintiff*)," and "the customary use, if any, of the premises by others (including the *plaintiff*)[.]" *Id.* (emphasis added). After hearing arguments by the parties regarding proposed additional changes to the instruction, the trial court decided to strike the parentheticals.

¶20    The trial court also considered whether Mid America's claim for punitive damages should be submitted to the jury. After deferring its ruling in order to hear the evidence relevant to the claim, the court determined that although Mid America had established a prima facie case for punitive damages, in that it had demonstrated that Container Life continued to use the Trailer Yard and Drop Off Lot even after Mid America had pointed out that they were not included in the lease, Container Life's actions did not rise to the level of being "sufficiently aggravated" such that punitive damages were warranted. The court therefore declined to submit the issue of punitive damages to the jury.

¶21    After deliberating the issues before it, the jury determined that Container Life was trespassing on the Trailer Yard and the Drop Off Lot; that Mid America was entitled to possession of those parcels; and that Container Life had been unjustly enriched by its use of those parcels. Furthermore, the trial court found that Container Life's equitable counterclaim for reformation of the lease to include the Trailer Yard was not warranted. The court therefore entered a judgment in the amount of $458,222, plus costs and attorney's fees, in favor of Mid America, and dismissed Container Life's counterclaim with prejudice. This appeal follows.

**DISCUSSION**

¶22    On appeal, Container Life asserts that the trial court erred in several ways, including denying its motion to bifurcate its counterclaim from Mid America's claims; declining to give a jury instruction on the duty to speak; declining to allow advisory questions on the special verdict form relating to the reformation of the lease; the court's modification of the pattern jury instruction for implied consent; and dismissing its counterclaim for reformation of the lease. Additionally, Mid America appeals on the issue of punitive damages, contending that the court

erred in failing to allow the jury to consider that claim. We review each of these arguments in turn.

*Bifurcation*

¶23 We begin with Container Life's assertion that its equitable counterclaim for reformation of the lease should have been bifurcated from the legal claims of Mid America. The decision of whether to bifurcate claims is within the trial court's discretion. ***Dahmen v. American Fam. Mut. Ins. Co.***, 2001 WI App 198, ¶11, 247 Wis. 2d 541, 635 N.W.2d 1. This court will not reverse such a discretionary decision "unless it is clearly shown that the trial court failed to consider the relevant facts, apply the proper standard of law and reach a conclusion a reasonable judge could reach." ***Id.***

¶24 In making its decision regarding bifurcation, the trial court "must consider the potential prejudice to the parties, the complexity of the issues, the potential for jury confusion and the issues of convenience, economy and delay." ***Id.*** At the hearing on this motion, the trial court considered all of these factors. As described above, the court was particularly mindful of the potential for prejudice to Mid America if the reformation claim was bifurcated, due to the probability of overlapping evidence, which could result in the court making factual findings relating to issues that should properly be before the jury with Mid America's legal claims. *See **id.*** The court further observed that this case was "as likely to go to a jury trial if the reformation claim is heard and decided first or if it is not"; in other words, bifurcation would not result in a resolution where a trial on Mid America's claims would be eliminated. Thus, there would likely be no judicial economy, or cost savings for the parties, that would result if that issue was bifurcated. *See **id.***

¶25 Additionally, the trial court found that the issues for the jury on the legal claims would not be "any less complex" if the reformation counterclaim was bifurcated and decided first. *See id.* Finally, the court noted that there were still scheduling backups due to the pandemic, and that bifurcating the reformation counterclaim, and thereby having to schedule two trials, would create an "undue delay" in resolving all of the issues. *See id.*

¶26 Container Life, however, cites *Carroll v. Bohan*, 43 Wis. 218 (1877), for the premise that in a trespass action where a counterclaim for reformation is filed, "[t]he proper practice … is to try the issue upon the equitable counter claim first[.]" *Id.* at 219. Indeed, our supreme court recognized in the *Carroll* decision that while the rule for bifurcation "generally rests in [the] discretion" of the trial court, in this type of case bifurcation "seems to be imperative." *Id.* at 219-20. The claim in *Carroll* involved a store that had been mortgaged, with the issue being whether the "entire stock of goods" of the store was included in that mortgage. *Id.* at 220. The jury informed the trial court that it was unable to answer this question, but rendered a verdict nonetheless; the supreme court ultimately held that verdict was insufficient. *Id.* at 220-21. The supreme court observed that the counterclaim for reformation of the mortgage to include the chattel property at issue was "very much overlooked throughout" the proceedings, with the verdict on the equitable issue of the counterclaim essentially being "advisory only[.]" *Id.* at 220.

¶27 In the present case, the trial court distinguished *Carroll*, noting that "[t]his is not a situation where the jury is not able to make decisions about entitlement to property or damages to property until the [trial] [c]ourt figures out which property is at issue," because it was "very clear" that the parcel at issue in the counterclaim was the Trailer Yard. The court believed that the jury would be able to make findings regarding Mid America's claims for trespass, ejectment, and unjust

10

enrichment as they related to the Trailer Yard and Drop Off Lot without a prior determination regarding the reformation counterclaim.

¶28 We agree with the trial court's assessment in distinguishing *Carroll*. We further conclude that the trial court applied the proper legal standard in exercising its discretion in deciding not to bifurcate the reformation counterclaim. *See Dahmen*, 247 Wis. 2d 541, ¶11. Therefore, the trial court did not err in denying Container Life's motion for bifurcation. *See id.*

*Jury Instruction for Duty to Speak*

¶29 We next review Container Life's argument that the trial court erred in denying its request to include a jury instruction regarding the duty to speak. This instruction relates to whether the Higginses had a duty, prior to executing the Asset Purchase Agreement and lease, to inform Container Life that the Trailer Yard and Drop Off Lot were separate parcels from the main operating site. The decision of whether or not to give a requested jury instruction is also within the discretion of the trial court. *Arents v. ANR Pipeline Co.*, 2005 WI App 61, ¶42, 281 Wis. 2d 173, 696 N.W.2d 194. In fact, the trial court "is afforded great latitude when giving jury instructions." *Id.*

¶30 The trial court rejected Container Life's request for the instruction as untimely because it was not included in Container Life's proposed jury instructions submitted pretrial. The court further noted that it had "repeatedly" asked at the beginning of the trial whether the preliminary jury instructions were final, and counsel for Container Life had represented that they were.

¶31 The trial court also observed that Container Life's basis for requesting the duty to speak instruction—whether the Higginses had failed to disclose that the

11

Trailer Yard and Drop Off Lot were not included in the lease—was not a new position, but rather had been Container Life's argument throughout the proceedings. Thus, the court rejected Container Life's assertion that its untimeliness in requesting the instruction was due to evidence that was presented in the first several days of trial.

¶32    The trial court has within its discretion the inherent power to control its docket for purposes of judicial economy. *Neylan v. Vorwald*, 124 Wis. 2d 85, 94, 368 N.W.2d 648 (1985). To that end, the court had clearly stated its expectations for submissions of requested jury instructions, and explained why it believed that Container Life's request for an additional jury instruction was outside of the court's directive. Thus, the court did not erroneously exercise its discretion in declining Container Life's request to add the duty to speak jury instruction. *See Dahmen*, 247 Wis. 2d 541, ¶11.

*Advisory Questions for Special Verdict*

¶33    Container Life's next argument is that the trial court erred in denying its request to include several advisory questions relating to its counterclaim for lease reformation on the special verdict form for the jury to consider. As with jury instructions, trial courts have "wide discretion in determining the words and form of a special verdict." *City of Milwaukee v. NL Indus.*, 2008 WI App 181, ¶83, 315 Wis. 2d 443, 762 N.W.2d 757 (citation omitted).

¶34    Furthermore, the requested questions were, as noted, completely advisory in nature, given that they related to the equitable counterclaim of reformation, which was to be tried by the trial court, not the jury. Thus, for the issues raised in these questions, the trial court would have the "ultimate

12

responsibility" to make the findings of fact and conclusions of law regarding those issues. *See Abdella v. Smith*, 34 Wis. 2d 393, 397, 149 N.W.2d 537 (1967).

¶35 Here, the trial court determined that the requested advisory questions would "essentially" be "adding an entirely new kind of claim to the issues for the jury to decide," which the court deemed to be inappropriate. The court further stated that the issues of the reformation counterclaim were "straightforward," such that having the jury answer those questions was not necessary for the court to make its decision on the counterclaim. This determination was completely within the court's discretionary province, *see NL Indus.*, 315 Wis. 2d 443, ¶83, and we conclude that the court did not erroneously exercise its discretion in declining Container Life's request to include the advisory questions on the special verdict form submitted to the jury, *see Dahmen*, 247 Wis. 2d 541, ¶11.

*Modification of Jury Instruction for Implied Consent*

¶36 Next, we review Container's Life's argument that the trial court erred in its modification of the pattern jury instruction for implied consent, WIS JI—CIVIL 8015. The trial court "has broad discretion to craft jury instructions based upon the facts and circumstances of the case." *Smith v. Goshaw*, 2019 WI App 23, ¶9, 387 Wis. 2d 620, 928 N.W.2d 619. "The court must, however, exercise that discretion in a way that fully and fairly informs the jury of the rules of law applicable to the case and that assists the jury in making a reasonable analysis of the evidence." *Id.* "Whether the [trial] court erred by stating the law incorrectly or in a misleading manner is a question of law this court reviews *de novo*." *Id.*

¶37 As explained above, the trial court modified WIS JI—CIVIL 8015 to accurately portray Container's Life argument that there was implied consent by Mid America for it to use the Trailer Yard and Drop Off Lot. Specifically, the term

"plaintiff" had to be replaced by "defendant" in the last sentence of the pattern instruction in order to comport with the facts of the case. The court also struck two parentheticals from the pattern instruction where the term "plaintiff" was used.

¶38  Container Life, to the contrary, contends that the parentheticals were "essential" to provide the jury with clarification of the law of implied consent. Container Life therefore advocated at the jury instruction conference for substituting the term "defendant" for "plaintiff" in the parentheticals, as was done in the last sentence of the pattern instruction.

¶39  However, the trial court determined that striking the parentheticals altogether provided an accurate representation of the law without being misleading, and was consistent with the arguments and evidence presented by the parties. The final instruction given to the jury by the trial court, illustrated with the stricken parentheticals and modified language, is as follows:

> In determining whether an implied consent exists, you should look at all of the circumstances then existing, including the acquiescence of the possessor, if any, in the previous use of the premises by others (~~including the *defendant*~~); the customary use, if any, of the premises by others (~~including the *defendant*~~); the apparent holding out of the premises, if any, to a particular use by the public; and the general arrangement or design of the premises. If, under all the existing circumstances, a reasonable person would conclude that the possessor of the premises impliedly consented that the *defendant* be on the premises, then there was consent.

(Alterations added.)

¶40  This court "review[s] jury instructions as a whole to determine whether 'the overall meaning communicated by the instructions was a correct statement of the law ....'" *Smith*, 387 Wis. 2d 620, ¶13 (citations omitted; ellipses in *Smith*). Under the law, consent, which is a defense to a claim of trespass, "may

14

be given expressly or may be implied from the conduct of the plaintiff, from the relationship of the parties or from custom." *Grygiel v. Monches Fish & Game Club, Inc.*, 2010 WI 93, ¶41, 328 Wis. 2d 436, 787 N.W.2d 6.

¶41 We conclude that WIS JI—CIVIL 8015, as modified by the trial court, accurately reflects the law of implied consent, as it was to be applied to the particular facts and circumstances of this case. It fully informed the jury of the law on this issue, without being misleading or confusing, to allow for proper analysis when the jury reviewed the evidence. *See Smith*, 387 Wis. 2d 620, ¶¶9, 13. Therefore, the trial court did not erroneously exercise its discretion in giving the modified instruction. *See id.*, ¶9; *Dahmen*, 247 Wis. 2d 541, ¶11.

*Counterclaim for Reformation of Lease*

¶42 Container Life's final argument is that the trial court erred in dismissing its counterclaim for reformation of the lease. "Reformation of a written instrument is appropriate when the instrument fails to express the intent of the parties, either because of the mutual mistake of the parties, or because of the mistake of one party coupled with fraud or inequitable conduct of the other." *Hennig v. Ahearn*, 230 Wis. 2d 149, 174, 601 N.W.2d 14 (Ct. App. 1999). The party seeking reformation has the burden to prove, by clear and convincing evidence, that reformation is warranted. *First Nat. Bank of Kenosha v. Scalzo*, 70 Wis. 2d 691, 701-02, 235 N.W.2d 472 (1975). This court reviews the trial court's decisions on equitable claims under the erroneous exercise of discretion standard. *Wynhoff v. Vogt*, 2000 WI App 57, ¶13, 233 Wis. 2d 673, 608 N.W.2d 400.

¶43 Container Life's counterclaim for reformation reflects its theory in this case: that while it erred in failing to recognize that the parcel named in the lease—8570 South Chicago Road—did not encompass the Trailer Yard, the

15

Higginses and Mid America failed to disclose this fact to Container Life. The trial court noted the error on the part of Container Life in failing to fully investigate the property it was leasing. The court further observed that Mid America made a "misstatement" in the Asset Purchase Agreement with regard to its representation that the property to be leased, as described in the Agreement, constituted all the property which Mid America was utilizing for its business. However, the trial court found that the Trailer Yard was distinguished as a separate parcel in the Asset Purchase Agreement, and that a "cursory examination" by Container Life of the documents regarding the property involved in Mid America's business should have revealed the error at or prior to the time the Agreement was executed. It further acknowledged Michael Higgins's testimony that he believed Container Life had intentionally decided not to lease the Trailer Yard, at least in part because of possible environmental contamination.

¶44 Furthermore, the trial court determined that the "balancing of the equities" did not favor reformation. The court found that although the misstatement by Mid America in the representations of the Asset Purchase Agreement was a "technical misrepresentation," it was not intentional, and further, that it was not relied upon by Container Life, which had "received and reviewed reports from which it could have readily discovered the error." Indeed, the court observed that the lease was "negotiated between two sophisticated business entities[.]"

¶45 Moreover, the trial court found that Container Life had not established that the rent for the South Chicago property, without the inclusion of the Trailer Yard, was excessive. On the contrary, it concluded that reformation of the lease "would result in Mid America's loss of use of its real property, without additional compensation[.]" It therefore held that reformation of the lease was not warranted.

16

¶46    Upon review, the record supports the trial court's determination. Therefore, it did not erroneously exercise its discretion in dismissing Container Life's counterclaim for reformation.  *See id.*; *Dahmen*, 247 Wis. 2d 541, ¶11.

*Cross-Appeal for Punitive Damages*

¶47    Finally, we reach Mid America's cross-appeal, which asserts that the trial court erred in declining to allow the jury to consider whether punitive damages were warranted for Container Life's unauthorized use of the parcels not included in the lease.  "[W]hether there is sufficient evidence to submit the question of punitive damages to the jury is … a question of law" that this court reviews *de novo*. *Strenke v. Hogner*, 2005 WI 25, ¶13, 279 Wis. 2d 52, 694 N.W.2d 296.

¶48    The standard for awarding punitive damages, as set forth in WIS. STAT. § 895.043(3) (2019-20),[3] requires that there be evidence demonstrating that the defendant "acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff."   In interpreting this statute, our supreme court determined that there are three criteria that must be met before the issue of punitive damages can be submitted to the jury:  (1) a deliberate "act or course of conduct" where the actor is "substantially certain" that it will result in the plaintiff's rights being disregarded; (2) the act or conduct must "actually disregard the rights of the plaintiff, whether it be a right to safety, health or life, a property right, or some other right"; and (3) the act or conduct "must be sufficiently aggravated to warrant punishment by punitive damages."  *Strenke*, 279 Wis. 2d 52, ¶¶38, 40-42.

---

[3] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

¶49     Mid America contends that the trial court used the wrong legal standard in declining to allow the jury to consider the issue of punitive damages. Specifically, Mid America points to the court's statement that it believed that Mid America had established a prima facie case with regard to punitive damages. However, the court subsequently clarified that its statement referred to the fact that Container Life had acknowledged that the Trailer Yard and Drop Off Lot parcels were not included in the lease upon being told this by Michael Higgins shortly after the lease was executed, yet it continued to utilize the parcels.

¶50     The trial court went on to discuss the final criteria in the *Strenke* test—that in order to be presented to the jury, there must be evidence that Container Life's conduct was sufficiently aggravated in order to qualify for punitive damages. *See id.*, ¶38. In that discussion, the trial court recognized the importance of property rights; Mid America also focuses on this right in its argument in support of this claim, citing *Jacque v. Steenberg Homes, Inc.*, 209 Wis. 2d 605, 563 N.W.2d 154 (1997). In *Jacque*, our supreme court upheld a punitive damages award of $100,000 in a trespass case, even though the compensatory damages awarded were only the nominal amount of $1. *Id.* at 609. However, *Jacque* was decided almost eight years before *Strenke*, and does not specifically discuss the statutory standard for punitive damages; rather, the issue in *Jacque* was whether punitive damages could be awarded where there was essentially no compensatory damages. *Id.*, 209 Wis. 2d at 609.

¶51     Furthermore, the trial court here also noted that Michael Higgins's testimony indicated that he had "acquiesced to a certain degree" to Container Life's use of the Trailer Yard parcel. The court stated that this was likely in order to "not rock the boat" right after the Asset Purchase Agreement was executed, when the partnership between the Higginses and Container Life was just beginning. The court

further observed that there had been ongoing discussions and negotiations between the parties regarding the issue of compensation for the use of the Trailer Yard parcel prior to Mid America commencing this action.

¶52    Therefore, the trial court found that the evidence did not support a finding that Container Life's conduct was sufficiently aggravated to warrant sending the issue of punitive damages for consideration by the jury. Upon review, we conclude that the trial court properly considered the criteria set forth in *Strenke*, and did not err in declining to send this issue to the jury. *See id.*, 279 Wis. 2d 52, ¶13.

¶53    Accordingly, as we have rejected all of the claims raised on appeal by both Container Life and Mid America, we affirm the trial court's judgment and order in favor of Mid America, as well as its dismissal of Container Life's counterclaim for reformation of the lease.

¶54    No costs to either party.

*By the Court.*—Judgment and order affirmed.

Not recommended for publication in the official reports.